210 F.2d 712
 93 U.S.App.D.C. 183
 CARRADO,
v.
UNITED STATES.
MANFREDONIA,
v.
UNITED STATES.
SMITH,
v.
UNITED STATES.
WILLIAMS,
v.
UNITED STATES.
ATKINS,
v.
UNITED STATES.
JAMES,
v.
UNITED STATES.
TURNER,
v.
UNITED STATES.
 Nos. 11685-11687, 11689, 11694-11696.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Oct. 27, 1953.
Decided Dec. 10, 1953.
Petition for Rehearing Denied March 3, 1954.
 
 [93 U.S.App.D.C. 185] Mr. Joseph J. Lyman, Washington, D.C., for appellants Carrado and manfredonia.
 Mr. T. Emmett McKenzie, Washington, D.C., for appellant Smith.
 Mr. DeLong Harris, Washington, D.C., with whom Mr. Cutis P. Mitchell, Washington, D.C., was on the brief, for appellant Williams.
 Mr. Albert J. Ahern, Jr., Washington, D.C., with whom Mr. James J. Laughlin, Washington, D.C., was on the brief, for appellants Atkins, James and Turner.
 Mr. William J. Peck, Asst. U.S. Atty., Washington, D.C., at time of argument, with whom Messrs. Leo A. Rover, U.S. Atty., Lewis A. Carroll and Samuel J. L'Hommedieu, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee. Mr. Charles M. Irelan, U.S. Atty., Washington, D.C., at time record was filed, entered an appearance for appellee. Mr. William R. Glendon, Asst. U.S. Atty., Washington, D.C., at time record was filed, also entered an appearance for appellee.
 Before EDGERTON, WILBUR K MILLER and FAHY, Circuit Judges.
 WILBUR K. MILLER, Circuit Judge.
 
 
 1
 In the first count of a six-count indictment, returned October 15, 1952, the grand jury charged that, beginning about March 17, 1949, and continuing to the date of the indictment, the seven persons who are appellants here and seven other persons[1] conspired to traffic illegally in narcotic drugs; and that in furthering their conspiratorial objectives the defendants committed, among others, thirty-nine overt acts, which were briefly described. The next three counts accused the alleged conspirators of violating penal statutes concerning narcotics by selling to one John Henry Smith on February 6, 1952, seventeen one-grain capsules containing a mixture of heroin hydrochloride, quinine hydrochloride and milk sugar. Two more counts charged the alleged conspirators with substantive violations on February 27, 1952, based on the possession of one capsule containing a similar mixture.
 
 
 2
 When the case was called for trial in the United States District Court for the District of Columbia November 10, 1952, all of the indicted persons were present except Harry Tantillo, who had not been apprehended, and Letha Simpson, who was undergoing an operation that day. Paul Robinson pleaded guilty to the conspiracy[93 U.S.App.D.C. 186] count and the government agreed to dismiss the substantive counts as to him at the time of sentence. The trial of the remaining eleven defendants- including, of course, the seven appellants- then began. Shortly afterward, on the government's motion, Esther Wright was discharged under Sec. 23-110, D.C. Code 1951, and later became a witness for the United States. The trial proceeded with the remaining ten defendants until, at the close of its evidence, the government dismissed as to Pearl Woodward, leaving nine on trial. The jury acquitted Sam Palmer and Warren Williams, but found the remaining seven defendants guilty under all six counts. Dissatisfied with that result, they appeal.
 
 
 3
 As to the conspiracy, the prosecution presented testimony tending to show the conspirators organized and operated a narcotics syndicate headed by Harry Tantillo, of New York, which regularly transported contraband drugs from its New York member-wholesalers to the member-distributors- chief of whom was Randolph Turner- in the District of Columbia, who in turn supplied the illicit material to other members of the syndicate, who were retail salesmen. This testimony was furnished by two of the indicted fourteen and by two other witnesses, all of whom said they had been members of the syndicate and had been participants in its activities. They described the operation of the organization in considerable detail, and told of overt acts committed in furtherance of the conspiracy, including many of these charged in the first count of the indictment.
 
 
 4
 As to the sale of seventeen capsules to John Henry Smith, the basis of the first three substantive counts of the indictment, two police officers testified that on February 6, 1952, they took John Henry Smith, a known drug addict who had turned informer, to the vicinity of the home of the appellant Joseph Smith. Having first searched John Henry and removed all property from his person, the officers gave him $20,00 and sent him into Joseph's house. When he returned thirty minutes later, a search revealed he had seventeen capsules containing a white powder, and three one-dollar bills. A chemist later identified the powder as the mixture containing heroin.
 
 
 5
 Before calling John Henry Smith as a witness, government counsel informed the court he had been told by Smith's attorney that, for fear of self-incrimination, his client would refuse to testify concerning the incident just noted. This produced a legal argument before the court by John Henry's attorney and counsel for the prosecution, in which the latter insisted that John Henry could not incriminate himself by testifying to a purchase of narcotics made at the instance of the government, as criminal intent would be lacking. The trial judge said:
 
 
 6
 '* * * I see no rational basis for his claim that the questions propounded might incriminate him, in as much as there could be no criminal intent involved in answers to those questions. Therefore, he will be required to answer.'
 
 
 7
 After this statement the jury was brought in and John Henry's attorney, after consultation with his client, said, 'He is prepared to answer, if you want to propound the questions again.'
 
 
 8
 John Henry Smith then testified that he was taken to Joseph Smith's house, as the officer had said, and there bought seventeen capsules of the heroin mixture, not from Joseph Smith, but from a boy whom he did not know who told him 'Peter Rabbit' (Joseph Smith) was not at home. When this occurred government counsel submitted two writings to the witness and asked if he could identify the signatures thereon. He said he could not. Government counsel then announced surprise and was thereafter permitted, over appellants' objection, to propound leading questions to the witness. He continued to say he could not identify the signatures and that he did not buy the seventeen capsules from Joseph Smith himself.
 
 
 9
 The two writings were receipts which were later identified by Detective Sgt. [93 U.S.App.D.C. 187] Joseph A. Gabrys and received in evidence. Both were dated February 6, 1952. One receipt was for $3.00 'for information furnished to the Narcotic Squad.' The other acknowledged receipt from Gabrys of the sum of $17.00 for 'purchase of seventeen capsules of heroin from Joseph Smith * * * at 1323 West Virginia Avenue, Northeast, by John Henry Smith on above date.' Gabrys testified that John Henry Smith signed the two receipts in his presence.
 
 
 10
 In addition to the foregoing concerning the alleged sale of the seventeen capsules by Joseph Smith, Esther Wright testified that in her presence, when it was suggested to Joseph Smith that John Henry Smith was 'wrong' (that is, had turned informer), Joseph said, 'Well, I certainly sold him seventeen capsules.'
 
 
 11
 As to the possession of one capsule of the mixture containing heroin, there was evidence that on February 27, 1952, five police officers, including Lt. Carper, a deputy U.S. marshal and a federal narcotics agent went to the house of Joseph Smith. The deputy marshal had a warrant of arrest for Joseph Smith and the narcotics agent had a search warrant for the premises. Two of the policemen knocked at the front door and represented themselves as vacuum cleaner salesmen. The defendant Warren Williams opened the door slightly, whereupon the officers entered, stating their identity, and saying they 'had a warrant for the place'; and the other officers, who had waited close by, entered practically at the same time. Joseph Smith, Warren Williams, Esther Wright and Pearl Woodward were in the house. One of the police officers pursued Joseph Smith into the bathroom on the second floor and observed him standing before a flushing toilet bowl in which a number of capsules were swirling. The officer removed one of the capsules, which contained a white powder later identified as the heroin mixture. This capsule became the basis of the last two substantive counts of the indictment. Further search of the premises revealed various paraphernalia used by drug addicts, and other indicia of narcotics.
 
 
 12
 Appellants attack the first count of the indictment for duplicity, because it charged them with conspiring to violate three different penal statutes. They seek to avoid the effect of the Braverman case, in which the Supreme Court said a conspiracy is a single crime no matter how diverse its objects,[2] by saying count one does not allege a single conspiracy in violation of 18 U.S.C. § 371, and does not allege 'that the various other crimes charged, or the various conspiracies to violate other statues, were all a part of the single conspiracy.'
 
 
 13
 We observe, however, this language in the first count:
 
 
 14
 'During the period from on or about March 17, 1949, continuously to the date of the finding of this indictment * * * the defendants * * * conspired * * * to commit offenses against the United States * * * .' (Emphasis added.)
 
 
 15
 This sufficiently alleges, we think, the formation of a single continuing conspiracy[93 U.S.App.D.C. 188] to commit plural crimes. Consequently, under the Braverman decision, the first count of the indictment is not duplicitous.
 
 
 16
 The five substantive counts of the indictment are attacked on the theory that there was no evidence before the grand jury as to an essential element of the crimes charged. The theory is based primarily on the fact that the Treasury Department chemist who analyzed the contents of the capsules upon which the substantive counts were based and testified for the prosecution that the capsules contained a mixture of heroin and other substances, said on cross-examination he had not appeared before any grad jury with respect to that analysis. Concluding from this that the grand jury had no evidence before it that the capsules contained narcotics, the appellants proceeded to ask other government witnesses if they had appeared before the grand jury, but objections to such questions were sutsained. They sought and were denied production of the records showing who had testified before the grand jury with respect to this case. They noted that an earlier indictment against these appellants and their co-defendants in almost identical language with the present one had been found by an earlier grand jury and was pending when the present true bill was returned. From this they deduce that the grant jury may have adopted by reference testimony which its predecessor had heard and which it did not hear, and used such evidence as the basis for the indictment here.
 
 
 17
 These surmises of the appellants fall when they encounter legal principles. There is a strong presumption that a grand jury has faithfully done its duty according to the oath administered to its members. Moreover, guilt need not be demonstrated to a grand jury beyond a reasonable doubt and expert evidence as to contents of the capsules is not the only proof upon which the grand jury could have relied in accusing the defendants of trafficking in narcotics. A motion to quash an indictment for the absence or incompetency of evidence before the grand jury is addressed to the discretion of the trial court and its action thereon will not be reversed except upon a showing of abuse of discretion. Stewart v. United States, 8 Cir., 1924, 300 F. 769. It is also true that an appellant who attacks an indictment returned in due form on the ground that it was returned without sufficient evidence, has the burden of clearly showing the absence of such evidence. No such showing was made here.
 
 
 18
 In United States v. American Medical Ass'n, D.C.D.C. 1939, 26 F.Supp. 429, at pages 430-431, our late colleague, Judge James M. Proctor, then a district judge, wrote succinctly as follows:
 
 
 19
 '* * *(T)here is no question of a court's power to go back of an indictment to inquire whether vitiating irregularities induced the finding. United States v. Gouled, supra (D.C., 253 F.242); Laska v. United States, 10 Cir., 82 F.2d 672; United States v. Oley, D.C., 21 F.Supp. 281. That is conceded by government counsel. But it is a power sparingly used; justified only where by proper verified pleading a clear and positive showing is made of gross and prejudicial irregularity influencing the grand jury in returning an indictment. Averments on information and belief have been uniformly held not enough.'
 
 
 20
 Judge Parker, speaking for the Fourth Circuit in Allen v. United States, 1937, 89 F.2d 954, 956, considered Allen's contention that the trial court erred in refusing
 
 
 21
 * * * to permit appellant's counsel to cross examine witnesses for the purpose of showing that they were not examined before the grand jury, so as to lay a foundation for a motion to quash the bill of indictment on the ground that the grand jury acted upon insufficient evidence.'
 
 
 22
 [93 U.S.App.D.C. 189] He said:
 
 
 23
 '* * * The indictment was clearly insufficient and the judge very properly refused to permit counsel for appellant, on the trial of the case, to enter upon an inquiry as to what evidence was heard before the grand jury. The propositions of law involved are so elementary as not to justify discussion.'
 
 
 24
 To the same effect is Kraus v. United States, 8 Cir., 1937, 87 F.2d 656.
 
 
 25
 We cannot say the trial judge in this case abused his discretion in acting as he did concerning appellants' efforts to obtain proof that the grand jury did not have before it sufficient competent evidence to justify the indictment.
 
 
 26
 In addition to their attacks on the indictment, which we have just discussed, the appellants have advanced many other reasons for reversal which they have forcefully and earnestly supported in four voluminous briefs and on oral argument. We shall consider each point presented.
 
 
 27
 1. Appellants say the trial judge erred in granting the government's motion to discharge Esther Wright as a defendant so she might be a witness for the United States, under Sec. 23-110, D.C. Code 1951,[3] because this occurred after Paul Robinson, first witness for the government, had testified. Is is argued that Esther had 'gone into her defense' and therefore the judge could not grant the motion as the Code provision says he may do 'before a defendant has gone into his defense'. This was damaging to them, the appellants urge, because the discharged defendant had the advantage of hearing Robinson's lengthy story of the conspiracy before she took the stand, and her attorney had participated in the conferences of their counsel.
 
 
 28
 But until she was discharged Esther Wright was a party defendant and was required to be in the courtroom. Rule 43, Federal Rules of Criminal Procedure, 18 U.S.C. Regardless of any speculative prejudice to the appellants because of her presence, the question simply is whether the trial judge erred in granting the motion to discharge her. We do not think he did.
 
 
 29
 The Code section is not the source of the trial judge's authority to dismiss a defendant so he may be a witness against his former co-defendants, but is an immunity statute enacted for the benefit and protection of a defendant who is discharged for that purpose before he has been in jeopardy. The Code provision is not aptly worded, but we think Congress intended the words 'before a defendant has gone into his defense' to mean before he has been put in jeopardy. When and in what circumstances jeopardy attaches is not always easy to determine. That a jury has been sworn to try the issues- a basic test of jeopardy- is not invariably determinative. That being true, it seems to us that the statute's draftsman intended it to provide immunity from a second prosecution for a defendant who would not otherwise be entitled to it because he had not been in jeopardy.
 
 
 30
 In this connection the parties differ as to whether Esther Wright had actually 'gone into' her defense before she was discharged. We have already pointed out, however, that the court's authority to discharge her did not spring from the statute, and so the question whether she 'had gone into her defense' is not here. That question will not arise unless and until she claims immunity, under the Code section, from some future prosecution for the same offenses charged against her in the indictment from which she was discharged.
 
 
 31
 [93 U.S.App.D.C. 190] 2. Each of the five substantive counts accused all fourteen defendants of personally committing the violation therein described, and also charged them with committing it as co-conspirators. Pursuant to a defense motion before trial, the court ordered the government to file a bill of particulars
 
 
 32
 '* * * stating which of the defendants in the above-entitled cause are charged as principals and which of the defendants are charged as aiders and abettors to the principal charged in Counts 2, 3, 4, 5 and 6 of the indictment * * *.'
 
 
 33
 The bill of particulars filed in response to the order stated that the defendant Smith personally committed the violations charged in the last five counts and, as to each violation, added:
 
 
 34
 'The other defendants the government will show, aided and abetted the defendant Smith in committing this violation and likewise were guilty of advising and conspiring with him to commit it.'
 
 
 35
 At the conclusion of the evidence and at the court's suggestion, the government abandoned the 'aiding and abetting' theory, that is to say, it abandoned the charge that all the defendants had personally committed the violations described in the last five counts, either as active principals or as aiders and abettors. This was done because the evidence tended to show Smith alone had committed those violations and did not show the others had aided and abetted him. The questions then remaining for the jury to consider, under the five substantive counts, were whether Smith had personally committed the violations and whether the others were guilty of them as co-conspirators. As to the others, the question was whether Smith had done the affirmative acts pursuant to and in furtherance of the conspiracy; if so, then his co-conspirators were guilty under the substantive counts. Pinkerton v. United States, 1946, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489. Accordingly, the court did not submit to the jury the question whether the defendants other than Smith were guilty as 'aiders and abettors,' but instructed only on the question whether they were guilty with him as co-conspirators.
 
 
 36
 The appellants rely heavily on the fact that when a draft of the order directing the government to file a bill of particulars was submitted to the trial judge, it contained in the portion above quoted the word 'co-conspirators' as well as 'aiders and abettors,' and the court struck from the draft the word 'co-conspirators.' It is said this amounted to an election by the government to abandon the co-conspirator theory under the substantive counts and to rely upon the charge that Smith was the active principal and the others were aiders and abettors in the commission of those violations. Consequently, the appellants reason that the co-conspirator theory should not have been submitted to the jury; and, as there was no evidence to sustain the aiding and abetting theory, that the defendants other than Smith were entitled to be acquitted under the five substantive counts.
 
 
 37
 The flaw in their argument is that the order directing the government to file a bill of particulars did not constitute an election by the United States Attorney as to which theory he would pursue. The bill of particulars pointed out, as we have shown, not only that the government hoped to show the other defendants had aided and abetted Smith, but also that they were guilty of the substantive charges as co-conspirators with him. This was not only responsive to the order but was also affirmation of the same dual charge contained in all five substantive counts. Moreover, we observe that neither the court nor the appellants objected to the inclusion of the co-conspirator theory in the bill of particulars. It follows there was no election by the government to abandon the co-conspirator charge and the court did not err in submitting that theory to the jury.
 
 
 38
 3. Appellants allege error in the court's quashing of the subpoenas duces [93 U.S.App.D.C. 191] tecum served upon the United States Attorney which called for the production of written statements from witnesses the government intended to use at the trial. The first of these subpoenas, served October 30, 1952, demanded the production of the written statements of five persons named therein, none of whom was called as a witness at the subsequent trial. The second subpoena was served on the United States Attorney on the first day of the trial. It again demanded the production of the written statements of four of the five persons first named, and of four additional persons. Of the nine persons whose statements were thus sought by appellants, only two- Herbert Johnson and Nellie Leach- testified at the trial. Both said, and were confirmed by government counsel, that they had never given a written statement to the prosecution. It is, therefore, obvious that quashing these two subpoenas worked no hardship on the appellants since they concede they were entitled only to statements of persons who later became witnesses.
 
 
 39
 Also on the first day of the trial, the appellant Joseph Smith demanded by subpoena duces tecum the written statement of Esther Wright. The subpoena was quashed but, during the course of the trial, the appellants were furnished with two pretrial statements signed by Esther Wright and with a transcript of a statement dictated by her to a stenographer, which was typed after her departure and so was not signed. Appellants had these documents overnight and were afforded an opportunity to cross-examine Esther Wright concerning them. This makes it clear they were not prejudiced by the quashing of Smith's subpoena, which after all was not served in advance of trial.
 
 
 40
 In this connection appellants complain because written statements of the witness Robinson were not submitted to them in advance of trial. They were given the statements during the trial and were afforded a recess in which to examine them in order to prepare for cross-examination concerning them. We think this was sufficient.
 
 
 41
 4. It is argued that the trial judge committed reversible error in permitting the government to announce surprise when its witness John Henry Smith refused to state Joseph Smith was the seller of the seventeen capsules and refused to identify his own signature to the two receipts held by Officer Gabrys, one of which acknowledged receipt of $17.00 for 'purchase of seventeen capsules of heroin from Joseph Smith * * *.'
 
 
 42
 We find no error in the court's action, for, by Sec. 14-104 of the D.C. Code 1951, the trial judge may in his discretion allow the party who has been taken by surprise by the testimony of his own witness to prove, only for the purpose of affecting the credibility of the witness,[4] that the witness has made statements substantially variant from his sworn testimony about material facts. We said in Wheeler v. United States, 1953, 93 U.S. App. D.C.- , at page- , 311 F.2d 19, at page 25, '* * * (T)he trial court's ruling on 'surprise' may not be disturbed unless it plainly appears that the ruling is without any rational basis.' That is [93 U.S.App.D.C. 192] not so here, for we think the United States Attorney had the right to believe that, when the fear of self-incrimination was eliminated, the witness would testify in accordance with the receipt which he had given theretofore, and had the right to announce surprise when he refused to do so. Cf. United States v. Graham, 2 Cir., 1939, 102 F.2d 436, certiorari denied 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed 1524.
 
 
 43
 5. The appellants contend the court erred in denying their motion for a mental examination of the witness Robinson. The request for such an examination was made before Robinson began his testimony and was based solely on the statement of one of the attorneys for appellant Williams that he had interviewed Robinson and believed that he 'is possibly non compos.' He therefore moved that a mental examination be ordered or, in the alternative, that the defendants be permitted to have psychiatrists present in the courtroom to observe Robinson during his testimony. The court refused to order an examination but granted the request to have psychiatrists present as observers, and extended the same privilege to the prosecution. The government availed itself of this permission, but the defendants did not, and did not call as witnesses the psychiatrists whom the government had in attendance during Robinson's testimony. This failure was doubtless due to the fact that Robinson testified for more than two days and showed no indication of mental weakness, although he did admit that for a period of one year, which ended some eight months before the trial, he had been addicted to the use of heroin and that on one occasion while he was confined in the District Jail he had attempted to hang himself. Whether to order a mental examination of the witness was a matter within the discretion of the district judge. We do not think that discretion was abused.
 
 
 44
 6. The appellants complain that the paraphernalia for use in connection with narcotic drugs, which was taken from the person of Warren Williams in the raid of February 27, was illegally seized and should not have been received in evidence. Their theory is that this is so because the raiding officers had no warrant for the arrest of Williams. But when the officers entered the premises and observed the situation, they had ample cause to arrest and search all persons present, including Warren Williams. Relevant evidence obtained through the search of his person was not rendered inadmissible as to the other defendants by the fact that the jury later found Warren Williams not guilty. Wyche v. United States, 1951, 90 U.S. App. D.C. 67, 193 F.2d 703, certiorari denied 342 U.S. 943, 72 S.Ct. 556, 96 .Ed. 702, rehearing denied 1952, 343 U.S. 921, 72 S.Ct. 675, 96 L.Ed. 1334.
 
 
 45
 7. As another reason for reversal, appellants say the court erred in denying their motion for acquittal when it appeared that the government's evidence identifying as heroin the contents of the capsules was in hopeless conflict. The supposed conflict is based on the fact that Paul Robinson and Esther Wright, witnesses for the government, said heroin has a strong odor, while the chemist from the Treasury Department who analyzed the powder in the capsules testified that heroin has no odor. From this apparent conflict appellants reason that the government failed to prove the capsules contained heroin. The chemist said, however, that both quinine and heroin are very bitter substances and, if taken through the nostrils, they can be tasted and the taste is easily mistaken for an odor. There was, therefore, no real conflict in the statement of the government's witnesses concerning the contents of the capsules.
 
 
 46
 8. Appellants contend further that the trial judge committed reversible error in assisting the prosecuting attorney by making suggestions to him and by eliciting from a witness information which the prosecutor had failed to seek. Specifically the complaint is leveled at the following incidents:
 
 
 47
 (a) The court's questioning of Robinson developed the fact that he [93 U.S.App.D.C. 193] gave no written order for certain packages of heroin delivered to him in New York by Tantillo, and that the packages bore no stamps. These essentials of proof had not been brought out by the prosecutor when the judge asked the questions.
 
 
 48
 (b) When Robinson was testifying, the prosecuting attorney asked him to detail a certain conversation. Objection was interposed which, after argument, was overruled. The the government attorney began a different line of questioning and the judge reminded him he had not renewed his request that a conversation be detailed.
 
 
 49
 (c) In discussing an instruction offered by the government, the judge said there was no evidence that the other defendants had aided and abetted Joseph Smith in committing the violations set out in the substantive counts and that he proposed to instruct the jury it could find them guilty under the substantive counts only as conspirators, under the Pinkerton doctrine. Government counsel then announced abandonment of the aiding and abetting theory.
 
 
 50
 A trial judge should not indicate bias against a defendant, nor personal conviction of guilt. But it is well settled that he is more than a mere umpire, and is properly interested in seeing that all salient facts are presented to the jury. We see nothing improper in the court's conduct described in paragraphs (a) and (b) above.
 
 
 51
 The incident related in paragraph (c) above was simply the judge's indication of how he intended to instruct the jury. The prosecution's abandonment of its aiding and abetting theory was gratuitous and immaterial. It was the judge's duty to instruct the jury correctly, regardless of what theory any party might urge upon him in offering instructions. Had the court submitted the aiding and abetting theory, it might well have been reversible error.
 
 
 52
 9. After retiring to consider of its verdict, the jury sent a note to the judge asking for a copy of his charge. Thereupon the jury was brought back to the courtroom and the judge explained that the charge had not yet been transcribed and said, 'If there is any particular point which you wish read back, I can have the reporter find that point in her transcript and read it to you.' The foreman replied, 'You Honor, it wasn't any particular point. We thought if we had the whole thing with us we could refer to them as we went along.' Later a transcript of the judge's charge was sent to the jury room, over the objection of counsel for all of the defendants except Allen Williams, who said, 'I think it is a good thing.' Furnishing a copy of the charge to the jury is assigned as error.
 
 
 53
 In Copeland v. United States, 1945, 80 U.S. App. D.C. 308, 309, 152 F.2d 769, 770, certiorari denied 328 U.S. 841, 66 S.Ct. 1010, 90 L.Ed. 1815, this court said:
 
 
 54
 '* * *(W)e think it is frequently desirable that instructions which have been reduced to writing be not only read to the jury but also handed over to the jury. This course is required in some states, and is widely practiced. United States courts are free to follow it. We see no good reason why the members of a jury should always be required to debate and rely upon their several recollections of what a judge said when proof of what he said is readily available.'
 
 
 55
 We adhere to that statement.
 
 
 56
 10. The appellant Allen Williams, who was convicted as a conspirator, insists the evidence as to him showed no more than that on many occasions he had purchased narcotic drugs from many persons, including several of those accused in the indictment. He says it was not shown that he was any more than a mere customer or user of narcotics. Instructions embodying his theory, which he offered were given by the court as follows:
 
 
 57
 [93 U.S.App.D.C. 194] 'You are instructed that if you find * * * that the defendant Allan (sic) Williams had no personal knowledge of the conspiracy herein alleged, he is not a conspirator and is therefore not guilty * * * on all counts of the indictment.
 
 
 58
 'You are instructed that if you find that the defendant Allen Williams did not participate in the scheme or plan alleged and had only knowledge of the illegal acts of others, you must find him not guilty on all counts of the indictment.
 
 
 59
 'You are instructed that if you find as a fact that defendant Allan Williams was a mere purchaser of narcotic drugs from other defendants in this cause and did not participate in the conspiracy alleged, your verdict as to defendant Allan Williams must be not guilty as to all counts of the indictment herein.'
 
 
 60
 With Allen Williams' theory that he was a mere purchaser of narcotic drugs thus emphasized in the charge, the jury nevertheless found him guilty as a conspirator. It did not do so without evidence, for Esther Wright testified that she was present at a meeting at Randolph Turner's house in June, 1951, where she saw Allen Williams, Leon James, Randolph Turner and Letha Simpson. Among the subjects discussed was that of the retail price of heroin, for Joseph Smith said he thought he would raise the price from $1,25 to $1.50 per capsule, and Allen Williams remarked that he knew somebody who was getting $2.00. Esther further said that Allen Williams came to the home of Joseph Smith many times between June and September, 1951, and obtained capsules of heroin, which she or some of the others delivered to him. Paul Robinson testified that during a period of seven months he regularly delivered heroin to Allen Williams in quantities averaging five ounces per week, quantities which approximate those delivered to other retail salesmen. This evidence was enough to justify the jury in concluding he was a member of the conspiracy.
 
 
 61
 As we have indicated, we find nothing in the record, after a painstaking search, to warrant us in disturbing the jury's verdict. The case was carefully tried and the judge extended to the appellants every protection to which they were entitled. The judgments, therefore, must stand.
 
 
 62
 Affirmed.
 
 
 
 [1]
 Harry Tantillo, Paul Robinson, Sam Palmer, Warren Williams, Esther Wright, Pearl Woodward and Letha Simpson
 
 
 [2]
 Braverman v. United States, 1942, 317 U.S. 49, at page 54, 63 S.Ct. 99, at page 102, 87 L.Ed. 23. The Supreme Court said:
 'The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime and that is one, however diverse its objects.' (Cases cited.) A conspiracy is not the commission of the crime which it contemplates, and neither violates nor 'arises under' the statute whose violation is its object (Cases cited.) Since the single continuing agreement, which is the conspiracy here, thus embraces its criminal objects, it differs from successive acts which violate a single penal statute and from a single act which violates two statutes. (Cases cited.) The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute, Sec. 37 of the Criminal Code. For such a violation only the single penalty prescribed by the statute can be imposed.'
 In the present case each appellant received only one sentence under count one of the indictment.
 
 
 [3]
 The pertinent portion of Sec. 23-110 is as follows:
 'When two or more persons are jointly indicted the court may, before a defendant has gone into his defense, direct any such defendant to be discharged, that he may be a witness for the United States. * * * (S)uch order of discharge * * * equally with the verdict of acquittal, shall be a bar to another prosecution for the same offense.'
 
 
 [4]
 The trial judge so charged the jury when he said:
 'You will recall that the Government called John Henry Smith and, after he was called, the District Attorney announced surprise after he had given certain testimony; in other words, that the Government expected John Henry Smith to testify differently. In substantiation of this announcement the District Attorney produced statements made by John Henry Smith, which have been received in evidence and read to you. Now, such statements cannot be considered by you as evidence of the guilt of the defendants or any of them. They are admissible solely in order to permit the Government to show that, in offering the witness John Henry Smith, Government counsel had reason to believe that he would testify differently, and therefore to impeach the witness so the Government would not be bound by his testimony. It is not evidence of the facts stated in the paper, but is received only for the purpose of affecting the credibility of the witness John Henry Smith.'