771 A.2d 1094

Keith EDMONDS

v.

STATE of Maryland.

No. 2726, Sept. Term, 1999.

Court of Special Appeals of Maryland.

May 2, 2001.

Sherrie B. Glasser, Asst. Public defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Zoe M. Gillen, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City on the brief), Baltimore, for appellee.

Submitted before KENNEY, DEBORAH S. EYLER and ADKINS, JJ.

ADKINS, Judge.

A Baltimore City jury convicted Keith Edmonds, appellant, of murdering Eric Gardener during a failed robbery. In this appeal, Edmonds complains that he was wrongfully convicted on the testimony of a co-defendant who "turned State's witness" in the midst of their joint trial. We must decide whether, after listening to most of the prosecution's witnesses testify, his co-defendant should have been prevented from testifying for the prosecution.

The dilemma in this situation arises from the conflict between the co-defendant's constitutional right to be present in the courtroom during trial, and appellant's right under Maryland Rule 5–615 to have "the court ... order witnesses excluded [from the courtroom] so that they cannot hear the testimony of other witnesses." Although appellant admits there was no "technical violation" of Rule 5–615 in these circumstances, he argues that "the spirit if not the letter" of that rule was violated because his co-defendant undoubtedly was "taught" by the State's previous witnesses.

Because of the extensive remedies the trial court afforded to appellant, we conclude that the trial court did not err in refusing to exclude the testimony of the late pleading co-defendant. In addition, we find no reversible error arising from the trial court's questioning of a police officer during a preliminary suppression hearing. We do agree with appellant, however, that he was erroneously convicted and sentenced on two murder counts even though only one murder was committed. Accordingly, we shall affirm appellant's convictions for

felony murder, handgun offenses, attempted second degree murder, second degree assault, three counts of attempted armed robbery, and three counts of conspiracy to commit armed robbery, but vacate the conviction and sentence for second degree murder.

## FACTS AND LEGAL PROCEEDINGS

Appellant Edmonds was charged, along with Lewis Bailey, with first degree murder, felony murder, and related counts. Before voir dire on August 23, 1999, the State had plea discussions with both defendants. The State's plea offer for both Edmonds and Bailey was for guilty pleas on the felony murder, use of a handgun, and attempted murder charges, with a sentence recommendation of life imprisonment with all but 20 years suspended. Attorneys for both defendants advised the court that their clients contested the 20 years as excessive.[1]

Over the State's objection, the trial court responded that "the best I could do would be life, serve the first 15." He instructed defense counsel that "[i]f they are going to take it, take it. If not, let's select the jury." Both attorneys conferred separately with their clients, then advised that "we have a split decision" because Bailey was agreeable to the offer, but Edmonds was not. The trial court replied, "That's a no. It has got to be both. I won't split it." Trial proceeded on all counts against both Edmonds and Bailey. The court ordered all witnesses and potential witnesses excluded from the courtroom.

Officer Chris Boyd testified that on September 12, 1998, he responded to a call about a shooting in the 200 block of North Eutaw Street. When he arrived, he saw a group of people fleeing and two males lying on the ground. One victim, later identified as Rudolph Lyons, had been shot in the eye, but was alive. The other victim was Eric Gardener. He was dead.

---

1. The 20 year term was at the bottom of the sentencing guidelines for the charges against Bailey, and 5 years below the guidelines for the charges against Edmonds.

Lieutenant James Shields, Jr., the primary homicide detective assigned to the Gardener murder, testified that when he arrived at the scene, he saw a gun on the ground. He later learned that it belonged to Gardener.

Detective Don Lee, who was assigned to the City's "Violent Crime Task Force" investigating non-fatal shootings, received a call that same evening to investigate two "walk in gunshot victims" at the nearby Shock Trauma unit of the University of Maryland Hospital. At Shock Trauma, Bailey told Lee that he and Edmonds had been shot while trying to "hack" a ride. He was struck by two bullets, but did not see the shooter. He denied that either he or Edmonds had a gun or had shot anyone.

William Faulkner testified that he was with Lyons, his friend, and Gardener, his cousin, when they were shot. The three were walking down Eutaw Street when three men approached them, with their hands in their pockets. They pulled out guns, "[t]wo automatics and one revolver." He heard them say something about a stick up before he turned and ran. When he looked back, he saw Lyons' "hands in the air and two of the men checking his pockets." Then he heard gunshots and realized that several shots had been fired in his direction. He returned to the scene several minutes later, and found both Lyons and Gardener on the ground. Faulkner claimed that neither he nor Lyons was armed that night, but said that Gardener had a 9 millimeter handgun. He was not able to identify any of the three assailants.

Gary Salmon testified that in September 1997, he was incarcerated at the Baltimore City Detention Center. While he was in the infirmary, Edmonds told him that he and two other men intended to commit a robbery, but the victim resisted, pulled out a gun, and a gun battle ensued. Edmonds claimed that the victim fired first, and that, although both of his friends were armed, he was the only one who fired his gun. According to Salmon, Edmonds also stated that after the shooting, the third male took their guns while Edmonds and his friend ran to the hospital. On his way, Edmonds tried to

wipe the gunpowder off of his hands. Salmon admitted that he was awaiting sentencing on pending charges and hoped his testimony would benefit him.

Daniel Vangelder testified as an expert in the field of gunshot residue analysis. He examined swabbings taken from both Edmonds and Bailey. He concluded that the test was negative for Bailey, but positive for Edmonds. He found no residue on the hands of Faulkner or Lyons, but did find residues on the right hand of Gardener. Vangelder opined that this test indicated Gardener may have fired a weapon within a few hours of when the test was taken. James Waxter, a firearms examiner, testified as an expert that from evidence secured at the scene, he concluded that although only one 9 millimeter handgun was found at the scene, two to four guns were involved in the shooting.

Lyons confirmed that Gardener had a 9 millimeter handgun that night.[2] He testified that all three robbers had guns. When he first saw them, he could see the handle and outline of the gun in the pocket of the middle man, who was wearing grey sweat pants. The middle man would not let him pass. One of the others then pulled out a gun, pointed it at Lyons' stomach, grabbed his gold chain, and said, "[Y]ou all know what time it is." Lyons pushed the gun away, grabbed his attacker's arm, and turned him around. At that point, he saw Faulkner running away. He heard the middle man, who was directly behind him, say, "Where are you going son?" At that point, he heard a shot from the same direction, and "a whole lot of shooting started ringing out." One of the bullets struck Lyons in the shoulder and he fell to the ground. While he was on the ground, he heard shots from what he believed, based on his familiarity with its sound, was Gardener's gun. Then, "the guy I had been tussling with, who walked up on me

---

2. Bailey was not present for the trial testimony of Rudolph Lyons, but he had been present for Lyons' substantially similar testimony during an earlier hearing.

and put the gun in my stomach, stood overtop of me and shot me in the eye."[3]

Lyons testified that he could not say whether all three robbers had fired their weapons. He described what the two who shot him were wearing, but could not describe the third robber because he was in the shadows. He identified Bailey from a photographic array, and at trial, as the "guy in the middle" who shot him in the shoulder. He remembered his hooded sweatshirt, hat, and gold tooth. He did not identify Edmonds from either the photo array or at trial, because he focused on the two who pulled the guns on him. He testified that he would be able to identify the third assailant who shot him in the eye, but that person was not present in the courtroom.

During trial, co-defendant Lewis Bailey and his attorney continued plea negotiations with the State. On the third day of trial, when the only State witnesses yet to testify were Lyons and Vangelder, Bailey decided to "turn State's evidence," in order to receive the benefit of a plea offered by the State. At the time, Bailey knew that Lyons claimed that Bailey was the man in the middle, and that his unidentified friend was the one who shot him in the eye. Bailey pled guilty to felony murder, two counts of attempted robbery, and one count of using a handgun in the commission of a crime of violence. As part of the plea agreement, he agreed to testify against Edmonds and the alleged third assailant, identified as Anthony Archer. In exchange, he was to receive a sentence of life incarceration, with all but 15 years suspended, plus concurrent terms for the other crimes, including at least 5 years without parole for the handgun charge.

The State proffered a summary of Bailey's anticipated testimony about the robbery and shooting. Bailey would claim that Edmonds and Archer had guns, but he was unarmed. This testimony contradicted two statements he made to police on the night of the murder. In those statements,

---

3. Lyons permanently lost sight in his right eye.

Bailey denied any involvement in the shooting of Gardener and Lyons, and said that Edmonds did not have a gun and committed no crime. Bailey's testimony would corroborate the testimony of Faulkner and Lyons that at least two of the robbers fired their weapons, and support the prosecution's theory that Edmonds was one of the robbers and one of the shooters that night.

Although this plea was similar to the one that Bailey wanted to accept before the trial began, and which the trial court would not consider as a separate plea, the court accepted Bailey's plea. Edmonds' attorney immediately moved under Rule 5–615 to exclude Bailey from testifying, on the grounds that Bailey's testimony was fatally tainted by his presence in the courtroom while the State's witnesses testified. The trial court denied the motion because Bailey had been a defendant up until that point, and therefore, was not subject to sequestration. Edmonds' attorney objected that nevertheless, the prejudice was so severe that it undermined the fairness of the trial.

> Mr. Bailey gave two statements on the evening of this incident ... that were quite different than what he has now given the State.... The question becomes why is it different? ... It ... may be different because he ... based his change on what he's heard from the State's witnesses.... [H]is testimony now becomes more consistent with what Mr. Faulkner has testified to, more consistent with what Mr. Lyons has testified to.... [T]here is ... a possible due process violation to Mr. Edmonds to allow this witness to testify.

Observing that "there [are] no Maryland cases on point," the trial judge admitted "some uncomfortableness with the idea that the defendant goes to trial with one strategy thinking a certain set of events are going to occur, and then has to face changed circumstances during the middle of trial." He concluded, however, that "any potential prejudice as a result of any conditioning is remedied by the availability [to] the defense of all the prior inconsistent statements...." Although the "notion that there will come times when people

who are sitting on one side of the trial table abandon that side and join the other side without advance[ ] notice" may be "constitutionally unpleasant," the judge pointed out that "it's been going on for time immemorial" and that no federal court has declared that a plea bargain during trial bars the late pleading co-defendant from testifying against the remaining defendant.

I'm not going to bar the admission of the testimony and remain comfortable that cross-examination and impeachment is the remedy to any deleterious effect of the testimony.

He agreed to "give any curative [jury] instruction" that Edmonds suggested regarding the presence of Bailey in the courtroom while other State witnesses testified.

Bailey testified that he had accompanied Edmonds and their friend Archer to a restaurant downtown where Archer saw some men wearing jewelry he liked. Archer told Edmonds and Bailey to get their guns. Bailey claimed that both Archer and Edmonds left to do so, and returned in 15 minutes. Bailey insisted that he did not have a weapon.

Outside the restaurant, the three would-be robbers approached the three victims on Eutaw Street. Edmonds and Archer pulled out their guns. Bailey was supposed to go through the three victims' pockets. Before he could do so, however, he "heard a lot of gunshots going off." Bailey was shot. He did not see who shot him, but believed one of the bullets came from Gardener's gun. Edmonds was also hit. As the three ran from the scene, Edmonds handed Archer his weapon. On the way to Shock Trauma, Edmonds told Bailey to tell the police that someone had tried to rob them.

Edmonds' attorney cross-examined Bailey about inconsistencies between his two statements to police on the night of the murder and his trial testimony, and about his motives for taking a plea that required him to testify after hearing the State's witnesses. Bailey testified that he wanted to plead guilty before trial, but the prosecutor would not let him because Edmonds refused to plead guilty. He denied that he

decided to "cop" a plea in exchange for his testimony only after hearing that Lyons would testify Bailey had a gun and was the one who shot him. He claimed that Lyons had mistaken him for Archer, who "look[ed] just like" Bailey. Although he denied tailoring his story about Edmonds' role in the shootings using what he heard from the State's witnesses in order to obtain the plea by placing a gun in Edmonds' hands that night, Bailey admitted that the night of the murder, he told Det. Lee that Edmonds did not have a gun. His recorded statement to Lee was played to the jury.

Edmonds did not testify. His defense attorney cross-examined the gunshot residue expert Vangelder. Vangelder admitted that the gunshot residue on Edmonds' hands might have come from an object that was adjacent to a discharging weapon. He also acknowledged that the mere absence of gunshot residue did not necessarily establish that the person had not fired a weapon, but only that the residue had been removed.

The defense also recalled Det. Shields, because he took a written statement from Bailey on the night of the murder. Bailey had denied that Edmonds had a gun. The statement was introduced into evidence.

The trial court permitted appellant's counsel to propose a jury instruction regarding the effect that hearing the State's witnesses may have had on Bailey's testimony. The court gave the following instruction:

> Prior to the beginning of trial, all witnesses were ordered sequestered by the Court. Sequestration means that all witnesses are excluded from the courtroom so they cannot hear the testimony of other witnesses. The purpose of the sequestration of witnesses is to prevent them from being taught or prompted by each other's testimony.

> When deciding whether to believe all, part, or none of the testimony of [Lewis] Bailey, you may consider that Mr. Bailey, unlike any other witness, was in the courtroom during many of the witness' testimony and had the opportunity to hear them testify prior to his testifying. While this

was not a violation of the sequestration rule because at the time he was a party, you may still consider this fact in weighing Mr. Bailey's credibility.

In closing argument, appellant's counsel also emphasized that Bailey's presence in the courtroom during the State's case influenced Bailey's testimony.

The jury convicted Edmonds. This appeal followed.

## DISCUSSION

### I.

### Exclusion Of Co–Defendant's Testimony

Appellant contends that the trial court erroneously denied his motion to exclude co-defendant Bailey's testimony. He bases this argument on the language and purpose of Rule 5–615, which provides:

(a) **In General.** Except as provided in sections (b) and (c) of this Rule, upon the request of a party made before testimony begins, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses.... The court may order the exclusion of a witness on its own initiative or upon the request of a party at any time....

(b) **Witnesses not to be excluded.** *A court shall not exclude pursuant to this Rule*

(1) *a party who is a natural person* ....

(Emphasis added.)

The Court of Appeals recently emphasized the important reasons for sequestration.

The general purpose of the sequestration of witnesses "has been to prevent ... [witnesses] from being taught or prompted by each other's testimony." Additionally, the object of Maryland Rule 5–615 "is to prevent one prospective witness from being taught by hearing another's testimony; its application avoids an artificial harmony of all the

testimony; it may also avoid the outright manufacture of testimony."

*Tharp v. State,* 362 Md. 77, 95, 763 A.2d 151 (2000) (citations omitted); *see also Opus 3 Ltd. v. Heritage Park, Inc.,* 91 F.3d 625, 628 (4th Cir.1996) (witness sequestration "is designed to discourage and expose fabrication, inaccuracy, and collusion"). Our judicial system has long recognized that sequestration of witnesses is "one of the greatest engines that the skill of man has ever invented for the detection of liars in a court of justice." *Id.* at 628 (quoting 6 John Henry Wigmore, *Wigmore on Evidence* § 1838, at 463 (James H. Chadbourn ed., 1976)).

Nonetheless, appellant concedes—as he must—that there was "no technical violation [of Rule 5–615] inasmuch as Bailey was a co-defendant throughout the period during which he was present in the courtroom...." Instead, he seeks to apply the rule by analogy, contending that "the purpose of the rule mandated [Bailey's] exclusion once he opted to enter a guilty plea." Citing "principles of 'fair play and equity,'" appellant urges us to extend the rule in order to guarantee its substantive protections when a co-defendant agrees to testify as part of a plea bargain agreement reached during trial, after the co-defendant has heard the State's witnesses testify.

As authority for this extension, appellant relies solely on our decision and rationale in *Brent v. State,* 63 Md.App. 197, 492 A.2d 637 (1985). In *Brent,* we held that a trial court erroneously refused to recuse himself from serving as the judge in a bench trial. The judge previously presided at guilty plea proceedings of co-defendants, during which he heard factual statements implicating the appellant, and learned about the appellant's prior willingness to plead guilty. We recognized that the language of Maryland Rule 4–243(c)(5), which prohibits a trial judge from presiding in a bench trial once he has considered a plea from that defendant,[4] was not directly

---

4. In relevant part, the rule provides:

applicable because the judge never heard any formal plea agreement involving the appellant. We looked beyond the letter of that rule, however, because we also recognized that it was "but a 'vehicle for the implementation of basic due process rights'" and embodied "the notions of 'fair play and equity' [that] the Court of Appeals has said must govern the plea bargaining process generally." *Id.* at 204, 492 A.2d 637. We concluded that in these circumstances, "the judge was presented with the 'functional equivalent' of a formal plea agreement,'" because there was "no material distinction between the highly prejudicial information heard by the trial court in this case and that presented to a court during the formal tender of a plea agreement." *Id.* at 207–08, 492 A.2d 637. We held that "the totality of the circumstances bring the appellant's case within the spirit if not the letter of [the] Rule...." *Id.* at 208, 492 A.2d 637.

Appellant asks us to apply the same "spirit if not letter" rationale to Rule 5–615, given "the totality of the circumstances" in this case. Even though we agree with appellant that Bailey's presence in the courtroom while the State presented the testimony of four investigating officers, its firearms expert, a surviving victim, and Edmonds' prison acquaintance, made him the "functional equivalent" of an unsequestered witness, we do not agree that he should have been excluded from testifying, or that his testimony impermissibly "tainted" the trial. We explain.

■ We begin with the fundamental premise that a criminal defendant has a constitutional right to be present during trial. This "constitutional right to confront the witnesses against him immunizes him from ... physical sequestration." *Perry v. Leeke,* 488 U.S. 272, 282, 109 S.Ct. 594, 600, 102 L.Ed.2d 624 (1989); *see also Brown v. State,* 272 Md. 450, 457–58, 325 A.2d

If the defendant withdraws the plea and pleads not guilty, then upon the objection of the defendant or the State made at that time, the judge to whom the agreement was presented may not preside ... on any charges involved in the rejected plea agreement.
Md. Rule 4–243(c)(5).

557 (1974) ("substantive testimony concerning the guilt of the defendant cannot be submitted during his involuntary absence"); Md. Rule 4–231(b) ("A defendant is entitled to be present at ... every stage of the trial"). The question presented by appellant's proposed extension of the sequestration rule, of course, is not whether Bailey might have been excluded from the courtroom before his plea, but rather whether his testimony should have been excluded after he was no longer a party. Appellant argues that having exercised his right to hear the State's witnesses testify while he was a co-defendant, Bailey should have been precluded from thereafter testifying against Edmonds as part of a plea bargain.

Although we found no Maryland precedent governing the "mid-trial" plea bargain circumstances in this case, we are guided by our reasoning and decision in a similar case where the plea agreement occurred after a pre-trial deposition. In *Williams v. State,* 19 Md.App. 582, 313 A.2d 700 (1974), we rejected an analogous argument that because a co-defendant had exercised his right to be present during the deposition of a witness expected to testify for the State, the co-defendant, who reached a plea agreement with the State after that deposition, should have been precluded from testifying at trial. Citing due process and the co-defendant's right to attend the deposition under applicable rules, we held that the co-defendant "was entitled to be present during the deposition of [the witness] and *that circumstance did not prohibit his subsequent use as a witness for the State against [the appellant]."* *Id.* at 590, 313 A.2d 700 (emphasis added).

In *Williams,* we relied on a federal decision concerning the effect of a mid-trial dismissal of a co-defendant. In *Carrado v. United States,* 210 F.2d 712 (D.C.Cir.1953), *cert. denied,* 350 U.S. 938, 76 S.Ct. 310, 100 L.Ed. 819 (1956), the appellants argued that they had been unfairly prejudiced by the testimony of a co-defendant who was discharged during the trial, so that she then would testify for the government. They appealed the trial court's decision to grant the government's motion to discharge the late pleading co-defendant. The District of Columbia Circuit held that there was no error, because the co-

defendant had the right to remain in the courtroom until she was discharged as a party. *See id.* at 718–19. Because the appeal was from the motion to discharge, the *Carrado* Court declined to consider the prejudice that the appellants may have suffered as a result of her presence in the courtroom during the State's case.

Subsequent federal decisions, moreover, consistently have denied relief to defendants convicted on the testimony of a co-defendant who sat through part of a trial before reaching a plea agreement that required testimony against remaining defendants. *See, e.g., United States v. Chen,* 131 F.3d 375, 378–79 (4th Cir.1997) (en banc), *cert. denied,* 522 U.S. 1152, 118 S.Ct. 1175, 140 L.Ed.2d 183 (1998) (trial court did not err in failing to exclude testimony or to give cautionary jury instruction regarding credibility of co-defendant who pled guilty during trial); *United States v. Gambino,* 926 F.2d 1355, 1364 (3d Cir.) *cert. denied,* 501 U.S. 1206, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991) (mistrial not required because co-defendant changed plea and testified against remaining defendants); *United States v. Kilrain,* 566 F.2d 979, 982 (5th Cir.), *cert. denied,* 439 U.S. 819, 99 S.Ct. 80, 58 L.Ed.2d 109 (1978) (no error in admitting testimony of co-defendant where remaining defendants failed to demonstrate some "actual prejudice resulting from [the co-defendant's] supposed knowledge of defense strategy, or that [he] communicated such knowledge to the Government").

In this case, Bailey's constitutional right to be present in the courtroom while the State's witnesses testified makes this case comparable to the situations addressed in *Williams* and *Carrado.* It also distinguishes this case from *Brent.* The recusal dilemma we addressed in *Brent* did not involve a conflict between the rights of multiple co-defendants. Nor did our decision to extend the recusal rule to circumstances in which there was the "functional equivalent" of a formal plea agreement create a negative consequence for the exercise of any defendant's constitutional right.

In contrast, this case presents a direct conflict between appellant's sequestration rights under Rule 5–615, and his co-defendant's constitutional right to remain in the courtroom before the plea agreement. If we were to exclude Bailey's testimony because he became the "functional equivalent" of an unsequestered witness by exercising his right to be present in the courtroom, we would give Edmonds' sequestration rights priority over Bailey's constitutional right to remain in the courtroom. We decline to adopt a *per se* rule that would do so. As the Fourth Circuit recently observed, "the purpose and spirit underlying sequestration are not absolute; indeed, ... even the 'powerful policies behind sequestration' must bend to the dictates of the Constitution." *United States v. Rhynes*, 218 F.3d 310, 318 (4th Cir.2000) (*en banc*) (plurality opinion); *see Opus 3 Ltd.*, 91 F.3d at 628; *cf. Redditt v. State*, 337 Md. 621, 629, 655 A.2d 390 (1995) ("[v]iolation of a sequestration order does not result in a *per se* exclusion of the witness's testimony").

We hold that a trial court is not required, either by Rule 5–615, its purpose, its policies, or its "spirit," to exclude a former co-defendant's testimony in these circumstances.[5] Nevertheless, we agree with the trial court that when a co-defendant negotiates a separate plea agreement after having heard much of the prosecution's case-in-chief, there is reason for concern about influenced, tailored, or manufactured testimony. There simply is no denying that a co-defendant who "turns State's witness" during trial may have been "taught" by testimony that he would not have heard if the plea agreement had been reached before trial, and then may craft his testimony to bolster the State's case in order to secure a plea agreement, at the expense of the remaining defendant.

Here, the trial court recognized this possibility, and took mitigating steps to address it. Even though it correctly concluded that the sequestration rule did not apply, the court

---

**5.** A *per se* rule against a co-defendant entering into a plea during trial, and then testifying, could be expected to have a significant impact on the availability and conduct of joint criminal trials.

gave appellant nearly all of the same remedies he might have obtained under Rule 5–615. We hold that the trial court acted properly in doing so. A trial court faced with a mid-trial plea of one co-defendant must determine on a case by case basis whether to afford the remaining defendant any of the remedies available under Rule 5–615. *Cf. Redditt,* 337 Md. at 629, 655 A.2d 390 ("whether there is to be a sanction and, if so, what sanction to impose, are decisions left to the sound discretion of the trial judge").

The appropriate remedies in these circumstances are those that promote full disclosure of the circumstances of the plea bargain and the co-defendant's testimony to the trier of fact, including the remedies that the trial court afforded to appellant in this case—instructions to the jury at the time of the plea, admission of prior inconsistent statements by the pleading co-defendant, liberal cross-examination with respect to impeaching evidence, closing argument regarding the credibility and weight of the co-defendant's testimony, and an appropriate jury instruction. In most cases, such remedies will be sufficient to highlight for the jury the credibility issues raised by the co-defendant's mid-trial plea. In this case, they provided accurate information for the jury to consider in evaluating and weighing Bailey's testimony.

We disagree with appellant that exclusion of Bailey's testimony was necessary in this case.[6] The trial court properly recognized that exclusion of an unsequestered witness' testimony is a highly disfavored remedy, even when a party has violated a sequestration order. The Court of Appeals consistently has cautioned that because

---

**6.** We recognize that there might be some circumstances in which the exclusion or limitation of a late pleading co-defendant's testimony may be warranted, such as if there is evidence that the plea was timed to permit the co-defendant to hear the State's previous witnesses. In this case, there is nothing in the record to suggest that Bailey's plea was deliberately timed to circumvent the sequestration rule. *Cf. United States v. Gibson,* 675 F.2d 825, 836 (6th Cir.) *cert. denied,* 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982) (recognizing "consent, connivance, procurement or knowledge" of the prosecution to violation of sequestration rule as potential grounds for excluding testimony).

'[t]he ascertainment of the truth is the great end and object of all the proceedings in a judicial trial,' . . . the complete exclusion of the testimony of witnesses for a violation of the sequestration rule is not lightly to be imposed as a penalty upon even an offending party.

*Frazier v. Waterman Steamship Corp.*, 206 Md. 434, 446, 112 A.2d 221 (1955). "The loss of the testimony of an otherwise competent witness carries with it its own danger of injustice and the subversion of the ultimate search for truth." *State v. Earp*, 319 Md. 156, 172, 571 A.2d 1227 (1990). We find no abuse of discretion in the denial of appellant's motion to exclude Bailey's testimony, or in the court's use of curative remedies.

## II.

### Questioning By Trial Judge

### During Preliminary Hearing

■ Appellant also contends that the trial judge violated his right to a fair trial by engaging in a protracted examination of Lt. Shields, during which the judge suggested answers by using leading questions. Shields was the homicide detective who requested swabbing of Edmonds' hands for gunshot residue. Quoting at length from the transcript of a July 29, 1999 preliminary hearing on appellant's motion to suppress the test results showing gunshot residue on Edmonds' hand, appellant argues that "the trial judge's conduct 'went beyond the line of impartiality over which a judge must not step'. . . ." *See Vandegrift v. State*, 237 Md. 305, 311, 206 A.2d 250 (1965). The State counters that the questioning was proper, and that it had no influence on the jury because it was during a motions hearing involving matters that differed from the subject of Shields' testimony at trial.

The questions appellant complains about related primarily to knowledge and timing issues relevant to whether Shields had probable cause to detain Edmonds, and thus, to order the swabbings. Among these questions were the following:

- "How far is shock trauma from where these people [the robbers] disappeared from Faulkner's view?"
- "What time did you arrive [at Shock Trauma]?"
- "Now, between the time that you first saw Faulkner and when you arrived at the emergency room at 3 o'clock, were you in contact at all with Officer Lee from the Violent Crimes Task Force?"  The court asked a series of follow up questions regarding the communications between Shields and Lee, the police officer who initially interviewed Edmonds and Bailey in the emergency room because they were shooting victims.
- "How did you view the statement of Edmonds [to officer Lee] in terms of how the pieces of the puzzle were adding up?"  "Did you characterize it as exculpatory, meaning he was trying to give himself the best of it and make himself not a suspect?"  "But in the meantime, you considered the Edmonds statement exculpatory and therefore a drop in the bucket in terms of the information that was amounting at that time?  Is that what you are saying?"
- "Is it fair to say that you and Butler [the officer who remained at the hospital with Edmonds after Lee interviewed him and left] would have had a nasty conversation if those suspects had walked out of that hospital and you had to go find them again?"  "Were you aware that Butler was [in] control of Edmonds at the time that you dispatched . . . . [a witness] to the Homicide Unit [to give a statement]?  . . . You knew it was taken care of, essentially?"  "Did you both trust that night and acquire by circumstantial evidence after that night that Butler acted as a liaison or coordinator with other police and hospital security to make sure that Edmonds would not leave that hospital without you being able to at least interview him, if not charge him?"

We agree with the State that this questioning does not meet the threshold standard for reversible error.  Even if we were to conclude that these questions constituted error, we still cannot reasonably conclude that they could have "contributed

to the rendition of the guilty verdict" by the jury. *Taylor v. State*, 352 Md. 338, 346 n. 7, 722 A.2d 65 (1998) (quoting *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976)).

The trial court's questioning was indeed lengthy, detailed, and at times leading, but it directly related to facts that the court could inquire into in deciding whether to suppress the test results. At the hearing, the focus was on when and why Shields detained Edmonds at Shock Trauma, and thus, whether Shields had probable cause for the detention before he ordered the gunshot residue tests on Edmonds' hands. The trial court concluded at the end of the hearing, at which Shields was the only witness, that there was probable cause, and that the test results would not be suppressed. The court ruled that the search incident to arrest, evanescent evidence, and exigent circumstances exceptions to the warrant requirement applied. Appellant has never contested that ruling.

Instead, he complains that even though there was no jury at the hearing, "the same testimony would be elicited before them in several weeks' time. The witness having been prompted by the questions, learned what he was supposed to say [so that his] .... subsequent testimony [to the jury] was ... recollection prompted by the questions of the court." We disagree. Our comparison of the hearing transcript with the trial transcript reveals no such link. The matters about which the trial judge questioned Shields during the hearing were not the subject of Shields' testimony at trial. The court's questions at the hearing pertained to "who knew what when," because what Shields knew before he ordered the gunshot residue tests was the key to whether he had probable cause to detain Edmonds, which, in turn, was the key to whether the test results should be suppressed. These particular issues were not pertinent to the case later presented to the jury. Moreover, they were not pertinent to Shield's testimony at trial. Shields' trial testimony focused on the crime scene, the shooting victims, and the statements made by both the victims and the defendants. Shields did not even testify about his encounter with Edmonds and Bailey at Shock Trauma.

Given these differences in the subject matter of Shields' testimony at the suppression hearing and at trial, we are not persuaded that there is a reasonable possibility that these questions denied appellant a fair trial. Even if Shields was influenced by the court's questions during the hearing, we see no link between that "influenced testimony" and his trial testimony, and, thus, no link between the court's questions and the jury's guilty verdict.

## III.

### Improper Conviction And Sentence

### For Second Degree Murder

The State and appellant agree that appellant was wrongfully convicted of both felony murder and second degree murder, and wrongfully sentenced on both counts.[7] "In homicide cases, the units of prosecution are dead bodies. . . ." *Burroughs v. State*, 88 Md.App. 229, 247, 594 A.2d 625 (1991), *cert. denied*, 326 Md. 365, 605 A.2d 101 (1992). Because there was only one murder, there may only be one conviction and one sentence for murder. Because the felony murder is murder in the first degree, we shall vacate the conviction and sentence for the lesser, second degree murder.

**JUDGMENTS ON COUNTS FOR FELONY MURDER, UNLAWFUL USE OF HANDGUN, WEARING/CARRYING HANDGUN, ATTEMPTED SECOND DEGREE MURDER, SECOND DEGREE ASSAULT, ATTEMPTED ARMED ROBBERY, and CONSPIRACY TO COMMIT ARMED ROBBERY AFFIRMED. JUDGMENT AND SENTENCE FOR SECOND DEGREE MURDER VACATED. COSTS TO BE PAID ½ BY APPELLANT AND ½ BY MAYOR AND CITY COUNCIL OF BALTIMORE.**

---

7. Appellant was sentenced to life imprisonment on the felony murder count, and to thirty years, concurrent, on the second degree murder count.