866 A.2d 926

**Wesley Allen ROLLINS**

v.

**STATE of Maryland.**

No. 1333, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Jan. 28, 2005.

40

Argued by Stacy W. McCormack (Nancy Forster, Public Defender, on the brief), Baltimore, MD, for appellant.

Argued by Edward J. Kelley, (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, MD, for appellee.

Panel: DAVIS, SHARER, CHARLES E. MOYLAN, Jr. (retired, specially assigned), JJ.

DAVIS, J.

Appellant was charged with first degree premeditated murder, first degree felony murder, second degree murder, robbery, and burglary. On April 11, 2003, a Baltimore County jury presiding, convicted appellant of first degree felony murder, second degree murder, robbery, and burglary. Although the State sought the death penalty, appellant was sentenced to life without parole. Appellant filed a timely appeal and presents three questions for our review, which we rephrase as follows:

I. Did the circuit court err in admitting Dr. Pestaner's autopsy report, as well as allowing Dr. Ripple to testify about findings in that report, in violation of appellant's right to confrontation?

II. Did the circuit court err in allowing Dr. Ripple to render an expert opinion concerning the cause and time of the victim's death?

III. Did the circuit court err in allowing Dr. Ripple to testify as a rebuttal witness in violation of the sequestration rule?

Because examination of the record indicates that the circuit court redacted Dr. Pestaner's autopsy report before admitting

it into evidence, and because we shall hold that the medical examiner who did not perform the autopsy may render an opinion based on the objectively ascertainable "findings" contained in the report, we answer question I in the negative. · We shall also answer questions II and III in the negative and, accordingly, affirm the judgments of the circuit court.

## FACTUAL BACKGROUND

On October 19, 2001, John Ebberts called his Uncle, William Garland, and asked him to determine whether his mother, the victim, seventy-one year old Irene Ebberts, was all right. Upon arriving at the victim's house, Garland, his brother, and his brother's wife, noticed the screen door and front door were open. They entered the home and found the victim lying in her bed. Although her oxygen machine was still operating, she was unresponsive to Garland.

The paramedics subsequently arrived, responding to a "cardiac arrest" call from Garland, and pronounced the victim deceased upon arrival. After recounting the victim's poor health and recognizing "no signs of trauma," the paramedics turned off the victim's oxygen machine and the police arrived shortly thereafter. Baltimore County Police Officer Richard McCampbell was the first to arrive at the scene and the victim's relatives explained that the victim was in poor physical health. Officer McCampbell observed an open window near the victim, which had "dirt and debris" on the window sill, and noticed there was a garbage can adjacent to the open window outside the home. He subsequently contacted the Baltimore County Homicide Unit with what he deemed a "suspicious death." Homicide Detective Childs arrived and, after noting the same observations Officer McCampbell had made, discovered that the pillows were in the middle of the bed without covers, as well as "some evidence of ransacking or searching the bedroom."

During the investigation, officers discovered that cash and jewelry boxes belonging to the victim were missing. The victim's neighbor, the appellant, became a suspect after his

girlfriend provided the officers with information, including the fact that appellant told her he could kill the victim by "putting a pillow over her head." Appellant was arrested on October 24, 2001 and, during questioning, admitted to breaking into the victim's house to "borrow" money, but denied harming her. He was consequently charged with burglary on that same day and murder on October 31, 2002, after Dr. Joseph Pestaner's autopsy report concluded that the cause of death was smothering and the manner of death was homicide.[1]

In a pretrial motion, appellant asked the court to "preclude the medical examiner, Dr. Mary G. Ripple, from offering testimony and opinions. Based on hearsay information that is unrelated to the medical findings of the examination of the

---

1. The contents of the autopsy report may be summarized as follows: Pages two and three of Dr. Pestaner's report, captioned "INTERNAL EXAMINATION", detail the condition of the victim's body cavities, head, neck, cardiovascular system, respiratory system, liver and biliary system, elementary tract, genitourinary system, recticuloendothelial system, endocrine system and musculoskeletal system. Aside from the pathologies associated with the victim's bronchopneumonia exacerbated by severe emphysema and heart disease, the results of the internal examination were unremarkable. On page one of Dr. Pestaner's report, the external examination revealed a 1 inch contusion on the left elbow and the right arm had a 2″ × 1″ contusion. Under the caption, "EVIDENCE OF INJURY," Dr. Pestaner indicated: the right buccal mucosa adjacent to the upper denture, in an area adjacent to the root of tooth # 3, had a 1/4″ area of superficial hemorrhage. No petechiae were noted of the eyes, mouth, face or airway. The form of the neck was atraumatic. Under "MICROSCOPIC EXAMINATION," the following was noted: "Gum: Acute hemorrhage into underlying non-keratinizing squamous epithelium and into underlying connective tissue.... Right Forearm: Acute hemorrhage. Scattered iron positivity. Right Arm: acute hemorrhage. Iron stain negative." Dr. Pestaner's conclusions are summed up on the final page of the autopsy report:

This 71 year old white female, Irene Ebberts, *died of smothering, a lack of oxygen from covering the nose and mouth.* Ms. Ebberts was found dead in bed at her house. *Investigation revealed personal property missing and previous threats of harm had been made to smother Ms. Ebberts.* Autopsy revealed a sick woman who had significant heart and lung disease and an acute pneumonia was present in the lung. Evidence of smothering included hemorrhage in the mucosa on one side of the mouth. *The manner of death is homicide.* The decedent was not consuming alcoholic beverages prior to death and a comprehensive drug test was negative. There was no evidence of sexual activity.

alleged victim in this case . . . ." He averred that "the only medical findings cited in the autopsy report to support the medical examiner's conclusion that the cause of death was smothering and the manner of death was homicide is a microscopic area of superficial hemorrhage area one quarter inch in length that was found in the interior of the mouth adjacent to the root of a denture. The medical examiner's conclusions and opinions in this case are based upon hearsay statements that were provided by the investigating detectives in this case, rather than medical findings."

Citing Maryland Rule 5–702, appellant further averred, in his motion, "Because the medical examiner's opinion in this case is based on testimony from potential witnesses whom the State would otherwise be required to call in its case in chief rather than medical findings, this testimony would not help the jury understand the evidence or determine a fact in issue." Positing that the testimony of the medical examiner lacked a sufficient factual basis, the motion continues, "In this case, it remains the function of the jury to determine the veracity of the hearsay statements which contributed to the medical examiner's opinion."

Pertinent to appellant's assignment of error based on a violation of the Sixth Amendment to the United States Constitution, appellant concluded the Motion to Exclude the Testimony of the Medical Examiner thusly:

Because the medical examiner's opinion is based upon hearsay statements from witnesses who may or may not testify, the admission of such testimony would violate the defendant's rights under the Sixth and Fourteenth Amendments to the Constitution of the United States to confront and cross-examine witnesses, his right to trial by jury to determine the witness credibility issues under the Sixth and Fourteenth Amendments to the Constitution of the United States, and his right to Due Process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States.

Appended to appellant's Motion to Exclude the Testimony of the Medical Examiner is his Memorandum of Law in which he cites several cases in support of his position that the trial judge in the instant case erred in allowing the medical examiner to resolve non-medical questions of fact and assess credibility based on hearsay statements given to the police.

At the hearing on the motion to exclude Dr. Ripple's testimony, appellant advised the court:

[DEFENSE ATTORNEY]: I filed a motion in a rather lengthy memorandum of law in support of the motion. Originally when we filed the motion, we were under the impression that Dr. Joseph Pestaner, who performed the autopsy in this case, would be called by the State to testify regarding manner and cause of death. We have since learned that Dr. Pestaner is now a practicing coroner at the Riverside, California Sheriff's Coroner's office and that the Medical Examiner's Office has elected to substitute Dr. Mary Ripple to testify in this case.

Appellant's counsel conducted the following examination regarding the circumstances surrounding the decision to initiate criminal proceedings. These circumstances included a fax from Sergeant Rose Brady to Dr. Pestaner in support of his claim that Dr. Ripple had based her opinion—and ultimately her conclusion as to manner of death, in part, on hearsay obtained from sources other than the scientific findings contained in the autopsy report:

Q. *And that activity log demonstrates that there were many discussions between the police in this case and Dr. Pestaner in the time between when he first pended (shorthand for "pending") the cause of death on October 19th and when he changed it on October 29th, correct?*

A. He pended it on the 20th. Yes, he did pen[d] it on the 20th, not the 19th. Yes, we have a discussion with other medical examiners. We have—

Q. On 10–26?

A. And 10–20. And another thing that says 10–26 is unpended [unpenned] but obviously it is 10–29 as the date

on the letter. On 10–26 we have "discuss case with Sergeant Brady." Want me to read what is on here?

Q. Yes.

A. "Who would like us to wait until Monday to officially change DC." This case was done on the weekend. "Ten–26, discussed toxicology. Ten–26, Saint Agnes pulmonary has no records. Ten–29 discussed with Lieutenant Bowers." And the rest goes on to November.

Q. *So, actually, Dr. Pestaner actually waited to change the death certificate at the direction of Sergeant Brady of the Baltimore County Police Department,* is that not correct?

A. That is what it looks like when he says "would like to discuss, wait until Monday to officially change DC."

Q. And that is not the first correspondence that Dr. Pestaner had from Sergeant Brady from the Homicide Unit of the Baltimore County Police Department, is that not correct?

A. I believe there is a fax from the 22nd, and also we had—I assume they have an autopsy, that would have given us a report. I don't know who was there exactly.

Q. Let me turn to the fax. I turn to that page, the fax that you mentioned. Is that what you are talking about?

A. Yes. This was faxed on the 22nd.

Q. This is a fax from Sergeant Rose Brady to Dr. Pestaner?

A. Yes.

Q. Could you read for His Honor, what was the communication in the fax?

A. Certainly. "Joe, please review. This guy is too dangerous to leave out. *We are getting the murder warrant for him without cause of death." Then he has, "thanks, Rose."*

Q. *So contained within the file of the Medical Examiner's Office is a fax from one of the supervisors of the Homicide Division to Dr. Pestaner saying that they are going to go*

*ahead and charge Mr. Rollins with murder without a finding of cause of death?*

A. Yes, that is in the file.

Q. And that was after, that was received by Dr. Pestaner after he pended [penned] his findings regarding cause of death on 10–20?

A. On 10–20 he pended. On the 22nd he received this fax. Can I also state that in a discussion with Dr. Pestaner, that on the day of autopsy he was ready to call this case [2] but waited, which we have already stated the reasons for waiting were discussions with the detectives.

When asked, during the hearing on the motion to exclude, whether she relied on information developed by police and other investigative sources in arriving at her opinion, Dr. Ripple replied:

Q. All right. And is it safe to assume that you are in effect often relying upon law enforcement if they are involved in an unexplained death?

A. Certainly. You can look at it as if—we are like any other physician who is trying to take care of a patient. A physician will interview the patient and get a complete history, then do the physical exam and then order other tests. For us the patient is dead. So the history that we get is an account of the events leading up to or surrounding the death of the individual from law enforcement, relatives, witnesses, other physicians that took care of the patient, et cetera, and then our physical exam is the autopsy.

Referencing the testimony adduced on the motion to exclude, appellant presented his argument as to why the motion should be granted:

[DEFENSE ATTORNEY]: If they do not violate, in a criminal case, a defendant's right to confront and cross examine witnesses, under both the 6th and 14th Amendments to the Constitution and Article 21 of the Maryland

---

**2.** "Call this case" refers to Dr. Pestaner's determination of cause of death.

Declaration of Rights. I think there are two cases that spell this out very clearly. One is Wren versus—

THE COURT: One Second. Now we are moving to a confrontation—

[DEFENSE ATTORNEY]: Yes.

THE COURT:—argument. That means to me, Mr. Cox, that unless this doctor is going to testify to the same exact thing based upon her observations and what the police said, that there is a confrontation issue.

[PROSECUTOR]: Well, Your Honor, there is always—

THE COURT: Let me give it to you this way. She is a pathologist. You have a cancer specimen from a hospital that was read by Dr. X last year. He says it is cancer. Doctor Y wants to come into Court and testify she looked at the same sample. It is okay. *If she wants to testify as to some of the other stuff doctor X said, then you got a confrontation problem.*

[PROSECUTOR]: I take it in your hypothetical you are talking about differing opinions then. Obviously if that was the Court's initial inquiry—

THE COURT: In other words, *if she is looking at the same thing and seeing the same thing and is going to testify to the same thing, then you don't have a confrontation problem because the opinion is hers, not the other fellow's who is gone.*

[PROSECUTOR]: Right. And that is accurate. She will be testifying consistently with the information that Dr. Pestaner has provided. In addition and there was reference made during the conscious [sic] examination of Dr. Ripple, I have spoken with her about issues not directly addressed in the autopsy and that she has worked on and researched and come to conclusions herself.

THE COURT: She says all she is going to say is I have looked at the same stuff he looked at and I'm saying the same thing.

[DEFENSE ATTORNEY]: Yes.

THE COURT: My understanding is that does not contain a confrontation problem.

[DEFENSE ATTORNEY]: At this time I'm talking about Dr. Pestaner's original autopsy report. *I think its introduction violates the confrontation clause. I cite you to 98 Md.App. 348, 633 A.2d 455—*

THE COURT: My understanding is that she has to pretty much state her own report and, therefore, it would be her report that would come in.

[DEFENSE ATTORNEY]: Right. But that [prosecutor] would then get to ask her, this is your report and it is a report based upon the same information and the only reason *the initial report is not coming in is because it expresses opinions of someone not here.*

[DEFENSE ATTORNEY]: Correct. And it is our contention that the introduction of the original *report without Dr. Pestaner to be available for cross-examination would—*

THE COURT: *Because it constitutes his opinion.*

[DEFENSE ATTORNEY]: Because it constitutes his opinion. And Wren points that out in which medical records were introduced in a trial that contained the opinions of doctors who were examining for sexual abuse. In the Ward case, which was—

* * *

[DEFENSE ATTORNEY]: They all agreed to what it was and in essence it was cumulative. That was in fact found by Judge Wilner to be a confrontation violation because you could not cross examine doctor B, C and D about the basis of their conclusion.

As we heard from the testimony here, there was a lot of speculation by Dr. Ripple as to what Dr. Pestaner was *basing his conclusions on, but, again, that is speculation on her part. Without Dr. Pestaner to be here to confront him, cross examine him—*

THE COURT: What is the cite in Ward?

[DEFENSE ATTORNEY]: It is 76 Maryland App. 654, Your Honor.

\* \* \*

THE COURT: So the rule adopted in Maryland is that it is up to the trial judge's discretion as to what would bring the opinion in without the basis as opposed to with the basis in the Federal Court system. And, I don't know what other judges do, but nobody will ever say that when the basis is asked for, that I haven't required the basis to be asked first.

I agree with you, once it is heard, it is over. That is my understanding of the law. I do understand your point, sir, but I'm not convinced that is what she testified to.

[DEFENSE ATTORNEY]: Thank you, Your Honor.

THE COURT: Remember what a hypothetical question is: [Prosecutor], I want to ask you with regard to the examination of this engineering structure and the reason this building collapsed, assume one—there has to be evidence of that—assume two—has to be evidence of that—assume three. Well, three is a test of the cohesion of concrete at the scene. Well, is this the type of test you use all the time? Yes, we use this all the time. Scientific test? Yes. Relied upon? Yes. You don't need testimony for that.

So I suppose we will have another go around with her when she testifies. We still got the Ward issue. I'm kind of leaning to what he says concerning that. So you got to come back and tell me why you see it as different.

\* \* \*

THE COURT: Well, I want to find out what [the prosecutor] had to say.

[PROSECUTOR]: Should we wait for Mr. Rollins to get hooked up? Your Honor, frankly, I guess a lot of my argument may end up needing some direction depending on what in particular the Court wishes to have addressed.

Primarily I guess the distinction I'm looking for is whether we are talking about the admission of the autopsy in total or admission of the autopsy that contains—

THE COURT: I haven't seen the autopsy. I don't know what you are talking about.

[PROSECUTOR]: Okay.

THE COURT: I mean, I don't know what the report is.

[PROSECUTOR]: All right. What I'm trying to say, Your Honor, is that I think if there is any issue, the issue *is only as to the admissibility of the expression of an opinion as to manner of death.* And in addressing, first off, and I looked at Ward and looked at Reynolds and then researched again the case law on the admission of an autopsy report, first off, Ward deals with psychiatric opinions and in Ward they make clear that psychiatry and I think it is also Reynolds addresses it even greater, that psychiatry is an inexact science. And, therefore, one in which they found that the right of confrontation cannot be in effect obviated by a hearsay exception or any other argument on the admissibility in that particular case as to those records and the expressions of opinions. *And that is why I raise it because if we are dealing with a distinction between the admission of the autopsy in total or if we are dealing only with the admission of the manner of death opinion—*

THE COURT: Let me say this to you. We have a difference of opinion. *In my opinion they have generated the issue and I do not think that Judge Murphy would say the same thing were these issues presented. He would put a caution there; that when it is an opinion, that person has a right to confrontation.*

[PROSECUTOR]: Thank you, Your Honor.

THE COURT: So far I'm to smothering and disease, and homicide. But not all homicides require expert opinion. You know, if you have somebody with a stab wound through their heart and they have no arms to have stabbed themselves, it is homicide. If also, somebody else

says I saw X put that knife in the heart, that plus this will mean it is homicide.

Once again, you have to generate to me some type of an issue in order for anything else other than that to be there. Do you understand that? In other words, I'm saying the only thing I can see here *that is an opinion is disease only because of what I recall having heard a hundred physicians testify before; secondly, smothering, and thirdly, homicide.*

[DEFENSE ATTORNEY]: Your Honor, I would suggest that if there is any burden to be met in this case, the State has to meet it if they want to introduce something that is written by an out-of-court declarant.

THE COURT: They are. They are going to have the doctor come in and she will testify that these are state-ments of fact; I'm going to accept her testimony and unless you have any other experts that will testify that any of this other stuff is a matter of opinion—

[PROSECUTOR]: I note my objection, Your Honor.

An extended exchange with counsel regarding the admissi-bility of factual findings as opposed to opinions was followed by the court's determination that it would ostensibly redact the autopsy report as to what it deemed to be opinion now, but would admit characterizations of conditions as "chronic," "acute," or "cloudy":

THE COURT: Give me all of those cases that everybody is citing. What did you cite from Judge Murphy?

MS. RAINS: Referring to [Defense Counsel]. I know that [Defense Counsel] cited Reynolds.

THE COURT: What did you cite from his book?

[PROSECUTOR]: From Judge Murphy's book there is a section entitled Section 804(D)(1) autopsy reports.

THE COURT: All right. What was the statute that you cited?

[PROSECUTOR]: Statute is Health General 5–309 through 311.

\* \* \*

THE COURT: *So what I'm going to do here is just to say that the only thing I really see is opinion is smothering, homicide—what did I say the other one was?*

[PROSECUTOR]: Disease.

THE COURT: and we will do a little preliminary thing ahead of time just to make sure that the doctor will say that the rest of these are factual observations.

[DEFENSE ATTORNEY]: I understand. I don't want to argue this—I understand where Your Honor is ruling on this. I want to make clear that we will be noting our objection. *It is our contention that such matters of whether something is chronic or not, whether something is acute, whether something is cloudy or not is something of interpretation.*

At trial, the State asserted appellant smothered the victim with a pillow on October 16, 2001. A critical aspect of the State's case was proving the victim had been dead for over sixty-six hours before her body was discovered. The State introduced appellant's statement to the police that he and Dorthea Gurkin broke into the victim's home on the night in question in search of money for drugs, but never harmed her while she slept. The accomplice testified that when appellant left the victim's home, he told Gurkin that the victim awoke and he had to put her in a "choke hold." Other State witnesses also testified that appellant had given them property owned by the victim. Three prisoners who were incarcerated with appellant testified that appellant made incriminating statements to them and appellant offered evidence to impeach their testimony.

Much of the State's case was based on the testimony of Ripple. As discussed, *infra.*, Dr. Ripple, who did not perform the autopsy, testified that she reviewed the case file and, in her expert opinion, the victim died of "asphyxia during the robbery" from smothering. Her conclusion was based on the physical findings in Dr. Pestaner's autopsy report and other information contained in the file. After establishing that the

records in the file were business records prepared in the ordinary course of business, she stated that she personally viewed all the tissues and sections of the heart on the microscopic slides that Dr. Pestaner prepared. Dr. Ripple stated that she viewed the police reports, witness statements, rough body drawings and notations, prior medical records, photographs, and Dr. Pestaner's findings in the autopsy report, and considered this evidence when rendering her opinion. Specifically, she stated that she based her opinion on "the investigative findings of our investigator and the police, the physical findings of autopsy, including microscopic sections and a review of [the victim's] health records."

Dr. Ripple, testified as follows:

Q: *Are you able to say to a reasonable degree of medical probability or medical certainty as to the cause of death of Irene Ebberts?*

[DEFENSE ATTORNEY]: Objection.

[THE COURT]: Overruled.

A: *To a reasonable degree of medical certainty Irene Ebberts died of asphyxia during the robbery and the physical findings indicate smothering.*

Q: Now, you can explain—I know you stated all the things upon which you base your opinion. Can you explain those and then how they relate to the expression of your opinion?

[DEFENSE ATTORNEY]: Objection.

[THE COURT]: Overruled.

A: Yes. *I will start by her physical findings, her natural disease processes.* She is a debilitated, sick individual. So you have to look at her natural disease processes and be able to exclude them as a cause of death. So that involves medical records and then the physical findings that I went through with her pneumonia, her emphysema and her heart disease. There is a difference between dying with disease and dying of disease. So with regard to the natural disease processes going on, that is the first thing.

*The second thing would be the investigation findings at the scene.* You can't work in a vacuum. You need all those pieces. So the investigative findings indicate that foul play had occurred, that foul play being the robbery and ransacking of the house and, in addition, there are witnesses—am I now allowed to say that now?

Q: Let me hold you up a second. I apologize that I may be throwing you off track. With your permission I would like you to do these step by step. You have made reference to an analysis to see whether or not she either died with disease or died of disease. [You] mentioned three diseases, in effect, I think. Can you explain for the ladies and gentlemen of the jury as to whether or not you were able to conclude that she either died with those [diseases] or if she died of any of those diseases?

[DEFENSE ATTORNEY]: Objection.

[THE COURT]: Overruled.

A: She died with heart disease and with lung disease.

Q: All right. You indicated that part of your function is to look at or eliminate those diseases as a cause of death. What do you base that upon or what is your conclusion and what do you base that upon?

[DEFENSE ATTORNEY]: Objection.

[THE COURT]: Overruled.

A: *I base that on the severity of the findings of her disease process as well as other intervening circumstances through investigation and other physical findings of injury at all.*

Q: Now I know I shouldn't have interrupted you. So you have indicated then that that finding has to go in conjunction with the other findings, is that what you are saying?

A: Absolutely. You have to take it all together.

Q: All right. So let's base it upon, if you can, what information you have related so far, first off, the infor-

mation you said that was provided by the police and then also your investigator's information and, I apologize, if you can pick it up back where you were.

[DEFENSE ATTORNEY]: Objection.

[THE COURT]: Overruled.

A: *I was at the investigation point but I believe I had stated the findings of our investigator, of the ransacking and the robbery, the police reports indicating ransacking and robbery and some witness statements in the police reports; also the physical findings at autopsy. There was a hemorrhage in her mouth where it shouldn't be, indicating pressure on the mouth, hemorrhage, bleeding. That is indicative of smothering, pressure to the mouth in some manner from an external force, be it a hand, be it a pillow, something pushing on her mouth. And, in addition—so that would be the smothering part.*

*In addition, there are other injuries on her that you can't ignore also.* They might not be part of the exact smothering but it is part of the injury that you have to take into consideration. Of course smothering is holding something over the mouth. Just because I have bruises in my arms doesn't mean that I'm smothered. But she does have bruises on her arms as I stated. So she has additional injuries.

She then concluded, relying on the condition of the body based on the findings in the case file, that the victim had died two to four days before the body was discovered.

Three expert witnesses for appellee disputed Dr. Ripple's conclusion on cause and time of death. The three experts believed the victim died of natural causes approximately one day before her body was discovered. Forensic entomologist Dr. James Armine testified that, based on the climate conditions in the victim's surroundings, there would have been bug or fly infestations near the body. He concluded that the victim "had to have been recently dead no more than six

hours" after her body was discovered because there was no infestation.

Chief Medical Examiner for the State of Delaware Dr. Richard Callery concluded, after reviewing the victim's file, that the victim died of "broncho pneumonia, an infection of the lungs, which was superimposed upon a debilitated state due to severe emphysema, which was oxygen dependent, chronic obstructive pulmonary disease and heart disease." He stated that, due to the victim's fragile skin, had she been suffocated, there would have been bruising near the nasal tubes, and in this case, there was not. He therefore concluded that the victim had been dead for "most likely" twelve to twenty-four hours before being discovered. West Virginia University Clinical Professor of Pathology Dr. James Frost testified that his conclusion, based on the case file, was that the victim "died of natural diseases," including "emphysema, pneumonia, and acute pneumonia."

After all of the evidence had been submitted to the jury, the prosecutor, during his closing argument, stated:

> And Dr. Ripple did not come in here and say based upon the medical findings alone I conclude that this was a smothering. Certainly based upon the medical findings she acknowledged that she could die from many of the other diseases that she had. But she took the step beyond and what her responsibilities are is to look into the circumstances and that is where we are right now.

> \* \* \*

> But you have other evidence that is available to you concerning what Wesley Rollins did on the 16th of October. *That is what Dr. Ripple took into additional consideration and that is why she made the finding that she did and you have heard that evidence.*

As noted, the jury subsequently convicted appellant of first degree felony murder, second degree murder, robbery, and burglary. At the sentencing hearing on April 11, 2003, the circuit court stated:

Well, here we are. One half an hour we have spent with Irene Ebberts and eight hours we have spent with Wesley Rollins. I'm sure you all know how I feel about that. The Constitution says that I have to make my own judgment as to whether or not he was a principal in the first degree, meaning in essence whether or not he committed murder and I don't agree with that because I think, as it was in the early days, I should be able to take the jury's verdict on that.

There is no judge of this court who has been around for awhile who has not seen juries convict a number of people he or she would not have convicted. Doesn't happen that often, but it does. Or vice versa, seen some juries who have let some people off that they would have convicted. It doesn't happen often, but it happens once in awhile.

This man will be sentenced to life without parole *because I can't in my own mind lay my head down on a pillow at night and conclude that beyond a reasonable doubt he committed this murder.* I have no sympathy or even a tiny bit of good feeling for [appellant]. If he could be charged and given the death penalty for being a horrible human being and a predator on society, I would give it immediately. I'm sorry. I have to be true to myself.

There were many witnesses that testified in this case. *I was impressed with every one of them as to whether [the victim] died a natural death or whether or not she was killed. It is all circumstantial evidence. And the last thing or one of the last things that [appellant's attorney] said was the Supreme Court indicating a wrongful execution based on circumstantial evidence that did not come up to the point of having that judge or jury being convinced beyond a reasonable doubt and I am not.* And the independent feeling that I have to make does not allow me with my judgment and my conscience and performing my responsibility to go any further on this sentencing form than to check off not proven.

[Appellant], I believe that the crimes that you have committed and your whole life, although your family says is

a Jekyll and Hyde situation, are due to your own driving force of self-gratification at every instance for [appellant] and nothing more. You have as bad a criminal record as anyone I have ever seen.

If I had been able to get to the form of aggravating and mitigating circumstances, *the mitigating circumstance that would have jumped out at me and caused me to give life without parole would be my inability to get beyond that point of saying beyond a reasonable doubt. Do I agree, and the law says a preponderance of the evidence, which in civil cases is 51 percent, do I believe by 51 percent he committed this murder? Absolutely.* What is beyond a reasonable doubt? The Court of Appeals has said don't put a percentage on that. If it was 75 percent I would think 72. If it was 68 percent, I would say 66. *No matter how you measure it, because of much, very scientific driven, good evidence that this frail lady died a natural death, I would not have been able to say anything else other than that.*

I am not convinced, if I had gotten to this point, that any of these things which are wrong with him, brain damage, seizure, adaptive function amounted to a point where they controlled him. Because self-gratification for him, always for [appellant], nothing else, to me is his existence. So I would not have been able to impose the death sentence for that.

From the above, based on the evidence, the circuit court found appellant committed the murder by a preponderance of the evidence. He could not, however, find beyond a reasonable doubt that appellant committed the murders, and therefore sentenced appellant to life without parole.

## DISCUSSION

### I

The gravamen of appellant's assignment of error, as stated in his brief on appeal, is that the trial court erred in overruling his objection to the autopsy report, "because the document

itself is hearsay, and its introduction violates my clients rights to confront and cross-examination of a witness under the 6th, 14th Amendment of the Constitution and Article 21 of the Declaration of Rights."

The Confrontation Clause, Amendment VI of the Constitution of the United States, and Article 21 of the Maryland Declaration of Rights guarantee the right of a criminal defendant to "be confronted with witnesses against him." U.S. Const. Amend. VI. The Supreme Court held in *Ohio v. Roberts*, 448 U.S. 56, 62–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), that the introduction of hearsay will not violate a defendant's right to confrontation if the hearsay is within a "firmly rooted" exception to the rule against hearsay or bears "particularized guarantees of trustworthiness." *See Chapman v. State*, 331 Md. 448, 457, 628 A.2d 676 (1993) ("firmly rooted" exceptions include, *inter alia*, business records).[3] "The primary interest secured by the confrontation clause is the right of cross-examination." *Crawford v. State*, 282 Md. 210, 214, 383 A.2d 1097 (1978). In *Crawford*,[4] the Supreme Court overruled *Roberts* with respect to testimonial hearsay statements; however, the Court retained the prior standards enunciated in *Roberts* in the case of non-testimonial hearsay statements. *Crawford*, 541 U.S. at ——, 124 S.Ct. at 1374.

## THE *CRAWFORD* DECISION

In *Crawford*, the United States Supreme Court declared that the Confrontation Clause prohibited the admission of "testimonial" hearsay, unless the hearsay declarant was unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Id.* at ——, ——, 124 S.Ct. at 1365, 1374. Petitioner Michael Crawford confessed that he and his

---

3. Since *Roberts*, the Supreme Court has held it need not be shown the declarant is unavailable to testify, nor must the declarant be produced at trial. *White v. Illinois*, 502 U.S. 346, 354–57, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).

4. References without citation to *"Crawford"* refer to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

wife, Sylvia, had gone in search of one Kenneth Lee and, finding him in his apartment, had stabbed him for allegedly trying to rape Sylvia. At his trial, the State introduced petitioner's confession, then played for the jury Sylvia's tape recorded statement[5] to the police describing the stabbing, even though petitioner had no opportunity for cross-examination. Determining that Sylvia's statement was reliable, the Washington Supreme Court upheld petitioner's conviction.

---

**5.** Petitioner, in his confession, gave the following account of the fight:
"Q. Okay. Did you ever see anything in [Lee's] hands?
"A. I think so, but I'm not positive.
"Q. Okay, when you think so, what do you mean by that?
"A. I coulda swore I seen him goin' for somethin' before, right before everything happened. He was like reachin', fiddlin' around down here and stuff ... and I just ... I don't know, I think, this is just a possibility, but I think, I think that he pulled somethin' out and I grabbed for it and that's how I got cut ... but I'm not positive. I, I, my mind goes blank when things like this happen. I mean, I just, I remember things wrong, I remember things that just doesn't, don't make sense to me later. (punctuation added). 541 U.S. at ——, 124 S.Ct. at 1357.
Because Sylvia's tape recorded statements to the police arguably differed from petitioner's account with respect to whether Lee had drawn a weapon before petitioner assaulted him and, hence, was evidence that the stabbing was not in self-defense, the State sought to introduce the following statement given to the police by Sylvia:
"Q. Did Kenny do anything to fight back from this assault?
"A. (pausing) I know he reached into his pocket ... or somethin' ... I don't know what.
"Q. After he was stabbed?
"A. He saw Michael coming up. He lifted his hand ... his chest open, he might [have] went to go strike his hand out or something and then (inaudible).
"Q. Okay, you, you gotta speak up.
"A. Okay, he lifted his hand over his head maybe to strike Michael's hand down or something and then he put his hands in his ... put his right hand in his right pocket ... took a step back ... Michael proceeded to stab him ... then his hands were like ... how do you explain this ... open arms ... with his hands open and he fell down ... and we ran (describing subject holding hands open, palms toward assailant).
"Q. Okay, when he's standing there with his open hands, you're talking about Kenny, correct?
"A. Yeah, after, after the fact, yes.
"Q. Did you see anything in his hands at that point?
"A. (pausing) um um (no)." *Id.*, at ——, 124 S.Ct. at 1357 (punctuation added). 541 U.S. at ——, 124 S.Ct. at 1357.

The question was whether the procedure employed by the trial court complied with the Sixth Amendment guarantee that, "[i]n all criminal prosecutions, the accused shall enjoy the right—to be confronted with the witnesses against him." *Id.* at ——, 124 S.Ct. at 1357. Barred from testifying against her husband, under a Washington statute that prevents a spouse from testifying without the other spouse's consent, the prosecutor sought to introduce Sylvia's statements on the ground that, because she had led petitioner to Lee's apartment, her statement could be admitted as an exception to the Hearsay Rule for statements against penal interests.

Admission of such evidence, countered petitioner, violated his federal constitutional right to be "confronted with the witnesses against him." The Washington Supreme Court upheld the admission of the statement, concluding it exhibited guarantees of trustworthiness. *Id.* at ——, 124 S.Ct. at 1358. Reversing the state court, the Supreme Court drew a distinction between "testimonial" and "nontestimonial" statements. *Id.* at ——, 124 S.Ct. at 1364. The Court explained that "testimonial" hearsay includes:

[a]t a minimum ... prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogation.

Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,"; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,"; "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial".

*Id.* at ——, ——, 124 S.Ct. at 1364, 1374 (citations omitted). *See Snowden v. State,* 156 Md.App. 139, 155 n. 26, 846 A.2d 36 (2004), *cert. granted,* 381 Md. 677, 851 A.2d 596 (2004).

Concerning "nontestimonial" hearsay, the Court further penned that "for example, business records or statements in furtherance of a conspiracy," as well as dying declarations, would not invoke the same analysis required for "testimonial" hearsay. *Crawford*, 541 U.S. at ——, 124 S.Ct. at 1367. *See Snowden*, 156 Md.App. at 156, 846 A.2d 36. The Court explained:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statement from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial."

*Crawford*, 541 U.S. at ——, 124 S.Ct. at 1374. Interpreting *Crawford*, we recognized, in *Snowden*, 156 Md.App. at 156–57, 846 A.2d 36, that "when the admissibility of non-testimonial hearsay is at issue, the individual states are entitled to determine what statements should be excluded, but when 'testimonial evidence is at issue . . ., the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination.'" (quoting *Crawford*, 541 U.S. at ——, 124 S.Ct. at 1374).

The United States Supreme Court, in *California v. Green*, 399 U.S. 149, 155–57, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), recognized that introduction of evidence within a hearsay exception may nonetheless constitute a violation of the Sixth Amendment right of confrontation:

> The issue before us is the considerably narrower one of whether a defendant's constitutional right to be confronted with the witnesses against him is necessarily inconsistent with a State's decision to change its hearsay rules to reflect the minority view described above. While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a

different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. *Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. See Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied.*

Given the similarity of the values protected, however, the modification of a State's hearsay rules to create new exceptions for the admission of evidence against a defendant, will often raise questions of compatibility with the defendant's constitutional right to confrontation. *Such questions require attention to the reasons for, and the basic scope of, the protections offered by the Confrontation Clause.*

... It is sufficient to note that the particular vice that gave impetus to the confrontation claim was the practice of trying defendants on 'evidence' which consisted solely of ex parte affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact. Prosecuting attorneys would frequently allege matters which the prisoner denied and called upon them to prove. The proof was usually given by reading depositions, confessions of accomplices, letters, and the like; and this occasioned frequent demands by the prisoner to have his 'accusers,' *i.e.* the witnesses against him, brought before him face to face.

Under *Crawford*, the states are accorded flexibility to determine whether a hearsay statement within an exception to the Rule offends the Sixth Amendment. The Supreme Court's

decisions also make clear that a confrontation violation may occur, notwithstanding a firmly rooted exception.

Notably, the following passage from *Crawford* elucidates the evil sought to be addressed by the Framers of the federal Constitution:

First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused. It was these practices that the Crown deployed in notorious treason cases like Raleigh's; that the Marian statutes invited; that English law's assertion of a right to confrontation was meant to prohibit; and that the founding-era rhetoric decried. The Sixth Amendment must be interpreted with this focus in mind.

Accordingly, we once again reject the view that the Confrontation Clause applies of its own force only to in-court testimony, and that its application to out-of-court statements introduced at trial depends upon "the law of Evidence for the time being." 3 Wigmore § 1397, at 101; accord, *Dutton v. Evans,* 400 U.S. 74, 94, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (Harlan, J., concurring in result). *Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause power-less to prevent even the most flagrant inquisitorial practices.* Raleigh was, after all, perfectly free to confront those who read Cobham's confession in court. This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard re-mark might be unreliable evidence and thus a good candi-date for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, *ex parte* examinations *might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have con-doned them.*

The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused—in other words, those who "bear testimony." 1 N. Webster, An

American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn *declaration or affirmation made for the purpose of establishing or proving some fact.*" *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), 541 U.S. at —–—, 124 S.Ct. at 1363–1364 (emphasis added).

### *THE BUSINESS RECORDS EXCEPTION*

■■■ Our reading of *Crawford* constrains us ineluctably to conclude that the opinions/conclusions in the autopsy report in the instant case fall squarely within the "business records" exception [6] of the hearsay rule and is, therefore, technically, non-testimonial hearsay. The receipt of an autopsy report as an official business record is governed by the provisions of Md.Code, Health General Article, § 5–311.[7] Thus, the una-

---

6. See Md.Code, Cts. & Jud. Proc. Art. § 10–101.

7. (a)(1) The Chief Medical Examiner and, as to their respective counties, each of the deputy medical examiners shall keep complete records on each medical examiner's case.
(2) The records shall be indexed properly and include:
(i) The name, if known, of the deceased;

vailability of the witness and prior opportunity for cross-examination required in the case of "testimonial" hearsay are not rights, under *Crawford*, which attach *automatically* to non-testimonial hearsay.

The Court of Appeals addressed the right to confrontation when the medical examiner who performed the autopsy was not called to testify in *Bowers v. State*, 298 Md. 115, 136–138, 468 A.2d 101 (1983):

> Bowers asserts that the admission of the autopsy report unaccompanied by the testimony of the medical examiner who prepared it violates his constitutional right to confront witnesses against him. He claims that in admitting the autopsy report the trial judge appears only to have considered the hearsay aspect of this record and did not examine whether its admission violated Bowers' Sixth Amendment right to confrontation of witnesses.

The Court of Appeals commented that the identical issue had been considered in *Grover v. State*, 41 Md.App. 705, 398

---

(ii) The place where the body was found;

(iii) The date, cause, and manner of death; and

(iv) All other available information about the death.

(b) The original report of the medical examiner who investigates a medical examiner's case and the findings and conclusions of any autopsy shall be attached to the record of the medical examiner's case.

(c) The Chief Medical Examiner or, if the Chief Medical Examiner is absent or cannot act, the Deputy Chief Medical Examiner or an assistant medical examiner, and each deputy medical examiner promptly shall deliver to the State's Attorney for the county where the body was found a copy of each record that relates to a death for which the medical examiner considers further investigation advisable. A State's Attorney may obtain from the office of a medical examiner a copy of any record or other information that the State's Attorney considers necessary.

(d)(1) In this subsection, "record":

(i) Means the result of a view or examination of or an autopsy on a body; and

(ii) Does not include a statement of a witness or other individual.

(2) *A record of the office of the Chief Medical Examiner or any deputy medical examiner, if made by the medical examiner or by anyone under the medical examiner's direct supervision or control, or a certified transcript of that record, is competent evidence in any court in this State of the matters and facts contained in it.*

A.2d 528 (1979), wherein appellant had relied on *Gregory v. State,* 40 Md.App. 297, 391 A.2d 437 (1978), arguing "that his Sixth Amendment right of confrontation was violated by the introduction of a document prepared in whole or in part by a party not present in court to testify." 41 Md.App. at 710, 398 A.2d 528. Judge Thompson, writing for the *Grover* court, said:

In *Gregory v. State, supra,* we noted that the field of forensic psychiatry was an inexact science and that differences of opinion frequently existed between experts in the field. This being so, we concluded that the opportunity to cross-examine a witness giving such opinion evidence could be of crucial importance. It should not be supposed that *Gregory* stands for the proposition that the confrontation clause of the constitution precludes the admission of all evidence under exceptions to the hearsay rule. *Dr. Azzarelli's statement in the autopsy report did not express any opinion. It merely stated his findings of the physical condition of the decedent's brain.* As such it falls under the category of a " 'fact or condition objectively ascertained,' and was probably admissible as a business record as provided by the *Md.Code,* Courts and Judicial Proceedings Article, Section 10–101. It was clearly admissible under *Md.Code,* Article 22, § 8 which has been construed by *Benjamin v. Woodring,* 268 Md. 593, 608, 303 A.2d 779 (1973) to make autopsy reports admissible as to facts, but not as to opinions." 41 Md.App. at 710–11, 398 A.2d 528 (footnote omitted).

The *Bowers* Court concluded:

As in · *Grover,* the autopsy report here merely stated findings as to the physical condition of the victim. The only thing that comes near to an opinion in the report are its final two sentences which state, "In view of the history and findings at autopsy, the death of MONICA MCNAMARA, a twenty-eight year old White female, is attributed to strangulation. The manner of death is HOMICIDE." Although it was only the opinion of the medical examiner that this was a homicide, there has never been any dispute but what it

was. Moreover, Bowers admitted that she was strangled. The autopsy report here was admissible without the testimony of the physician who prepared it. 298 Md. at 136, 468 A.2d 101.

■ Writing for the Court in *Bowers*, Judge Smith distinguishes between opinions contained in an autopsy report and "findings of the physical condition" of the decedent. Notably, in finding the autopsy report admissible without the testimony of the medical examiner who performed the autopsy, that the manner of death was undisputed was cited as the basis for receiving "the only thing that comes near to an opinion in the report." Maryland law, in 1983, when *Bowers* was decided, was—and continues to be—that a medical examiner, who did not perform the examination, may testify to the findings of the physical condition of the decedent, then render his or her opinion independent of any opinion of the medical examiner who performed the examination.

■■ The admission into evidence of routine factual findings contained in an autopsy report submitted to the State's Attorney's Office is authorized by Md.Code, Health General Article, § 5–311 and Md.Code, Cts. & Jud. Proc. Article, § 10–101, without the testimony of the medical examiner who performed the autopsy. Conclusions and conclusory findings susceptible to different interpretations that are critical to a central issue in the case are "testimonial" and subject to scrutiny under cross-examination. We explain.

■ The *Crawford* decision affords the states flexibility in the development of hearsay law in the case of non-testimonial hearsay and, thus, under the business records exception to the hearsay rule, the usual practice continues to be that an autopsy report may be admitted into evidence without testimony of its author. The exception to the exception, however, is where the hearsay which comes within the business records exception is, in contemplation of *Crawford*, "testimonial." We are guided in that determination by the development of Maryland hearsay law, as *Crawford* instructs. We look, therefore, to several Maryland decisions, including *Ward v. State*, 76

Md.App. 654, 659–663, 547 A.2d 1111 (1988), wherein Judge Wilner, writing for this Court, provides a luminous analysis as to what considerations trigger the Sixth Amendment right to confrontation:

As a general rule, hearsay testimony will not offend the right of confrontation where the hearsay is cloaked with a substantial indicium of reliability and the State can show that the declarant is unavailable. If the declarant is not unavailable, as in the case at bar, the State must show that the utility of cross-examination would be remote. We do not believe that either prong of this test has been satisfied. The fact that a hospital record may be generally admissible as a business record, against either a hearsay or confrontation objection, does not necessarily mean that each and every entry in it is so admissible. As we observed in *Gregory v. State*, 40 Md.App. 297, 325–26, 391 A.2d 437 (1978), *quoted with approval in Garlick*, 313 Md. at 220–21, 545 A.2d 27:

The mere fact that a document is part of a hospital record made in the ordinary course of the hospital's business, and may therefore be admissible under the hearsay rule, does not *ipso facto* make its admission comply with the confrontation requirement . . . .

We have here not *the routine record of a person's birth, or death, or body temperature, nor any other similar statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely.* We are dealing with the opinions of supposed expert witnesses, who, in this document, are giving testimony not only as to appellant's mental condition, but, more importantly, as to whether or not he is criminally responsible.

It is true, as the State points out, that the challenged testimony here did not directly address appellant's ultimate criminal responsibility but went only to the diagnosis of his mental disorder. We find that distinction to be unavailing, however. Although there was no dispute that appellant had

a mental disorder, the nature and consequences of the disorder were very much in contention.

* * *

The underpinning of *Gregory* was the recognition that psychiatry is not an exact science and that opinions as to one's specific mental condition and deficiencies can and do vary widely. We observed, 40 Md.App. at 326, 391 A.2d 437, that:

> One need do no more than peruse the reported appellate opinions touching upon the issue of a criminal defendant's 'sanity' to see the frequency with which well-qualified and presumably competent practitioners express different— and sometimes widely varying—opinions concerning the critical issue. Considering the less-than-certain and ever shifting state of the art, these opinions, given their ultimate potential effect, cry out for cross-examination.

This kind of diagnosis does not lend itself to objective confirmation. It is not something that can be validated by microscopic, chemical, or other precise scientific examination but remains primarily a matter of opinion based principally upon a trained professional's evaluation of the subject's behavior and responses to psychological testing. Unlike the kinds of medical facts noted in *Gregory* or medical conclusions having a more objective foundation, such as blood tests, this kind of opinion, especially where contested, is not so cloaked with a substantial indicium of reliability as to escape the need for confrontation.

* * *

*On this record, we are not prepared to say that cross-examination of the other team members would have been in any sense futile. The diagnosis was a matter of dispute between experts. It is not the kind of medical conclusion that enjoys a generic indicium of reliability. And despite Dr. Mokhtari's brief description of how the evaluation process works at Perkins, there was no indication of how each of the other psychiatrists and psychologists on the*

*team arrived at his or her individual diagnosis.* On cross-examination, counsel could have inquired as to what information each considered particularly relevant, how that information was weighed, the extent to which any team member may have deferred to the opinion of another team member, and many other aspects of how each member came to his or her conclusion. *Id.* at 659–663, 547 A.2d 1111. (Citations omitted)

 From the above excerpt, several precepts emerge. First, generally, we need not engage in any right to confrontation analysis with respect to routine records, *i.e.*, a "statement of fact or condition objectively ascertained and generally reliable." Second, the statement should be "free from any motive to record falsely." Pertinent to our discussion herein are the third and fourth precepts: the statement, and any presumptions deducible therefrom, should be undisputed and the prosecution must show that the utility of cross-examination would be remote. In *Ward*, the import of the testimony of the expert witnesses who testified for the State that an adjustment disorder is insufficient to cause one to not meet the test of not criminally responsible implicitly suggested the converse—that one suffering from an adjustment disorder *is* criminally responsible. The fact that the statement touched upon an ultimate issue and was a matter which was the center of contention required that the parties who rendered the opinion be available for cross-examination.

### *PUBLIC RECORDS EXCEPTION*

 Because *Crawford* specifically cites as firmly rooted the business records exception to the hearsay rule, our analysis has tracked Maryland law on the subject. Maryland Code Annotated, Courts and Judicial Proceedings Article, § 10–204, Public Record Admissibility Generally,[8] provides for admission

---

8. Section 10–204 provides:
 § **10–204. Admissibility, certification of public records**
 (a) A copy of a public record, book, paper, or proceeding of any agency of the government of the United States, the District of Colum-

into evidence of documents deemed to be public records. We are satisfied that any analysis pursuant to Maryland law governing public records would lead us to the same result that we have reached applying the business records exception. Specifically, factual findings contained in documents deemed to be public records may be received into evidence so long as the document is certified as being a true copy by the custodian of records. The Court of Appeals, in considering the admission of opinions, as distinguished from factual findings, held, in *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 612, 495 A.2d 348 (1985):

We agree that the Public Records exception to the hearsay rule appropriately allows the reception of reliable facts, and will be recognized in this state in the form in which it appears at Fed.R.Evid. 803(8). We make clear, however, that the term "factual findings" will be strictly construed and that evaluations or opinions contained in public reports *will not be received unless otherwise admissible under this State's law of evidence.*

The Public Records exception as here adopted will permit the reception of reliable facts otherwise difficult to bring before the trier of fact, *but avoid the influence of opinions that ordinarily ought to be received only after full opportu-*

---

bia, any territory or possession of the United States, or of any state or of any of its political subdivisions or of an agency of any political subdivision shall be received in evidence in any court if certified as a true copy by the custodian of the record, book, paper, or proceeding, and if otherwise admissible.

(b) Except as otherwise provided by law, a custodian of a public record in the State or other person authorized to make a certification under this section shall, upon request, provide a certified copy of the public record to a party to a judicial proceeding or the party's attorney.

(c) A certification under this section shall include:

(1) The signature and title of the custodian or other person authorized to make the certification;

(2) The official seal, if any, of the office; and

(3) A statement certifying that the copy is a true copy of the public record.

(d) A custodian or other person authorized to make a certification under this section may charge a reasonable fee for providing a certified copy of a public record in accordance with this section.

*nity for examination of the witness' credentials and full
opportunity for cross examination concerning the basis of
any opinion expressed.* We also make clear that even
though the burden rests upon the party opposing the intro-
duction of a public record to demonstrate the existence of
negative factors sufficient to overcome the presumption of
reliability, this does not mean that additional evidence will
be required in every case to meet that burden. Indicia of
unreliability may be contained in the report itself, or may be
disclosed by the evidence of the party offering the report.
*Additionally, we point out that the inclusion within a
factual report of inadmissible evaluations or opinions need
not necessarily result in exclusion of the entire report, and
the trial judge should consider redaction of the report in
that event.* We do not rule on the admissibility of these
reports because that determination should be made in the
first instance by the trial judge if they are offered on retrial.

 Thus, the only caveat imposed by the law govern-
ing the admission into evidence of public records is that the
burden rests upon the party opposing the introduction of a
public record to demonstrate factors sufficient to overcome the
presumption of reliability. Considering the precondition that
witnesses who author documents containing opinions be sub-
jected to cross-examination concerning the basis of any opin-
ion expressed, we are not persuaded that such a burden
conflicts with the Sixth Amendment obligation imposed by
*Crawford* as we have construed it, *supra.* Consequently, our
analysis under the law governing public records leads us to
the same conclusion as that under the business records excep-
tion.

## THE INSTANT CASE

Preliminarily, unlike in the instant case, the statement
challenged in *Crawford* was patently testimonial and the lower
court's ruling in admitting the hearsay statement was based
on several reasons it articulated as to why the statement was
trustworthy. The trustworthiness of the statement was also

the issue considered on appeal therefrom. Moreover, the challenged hearsay exception in *Crawford* was a statement against penal interest, whereas here we consider the business record exception.

■ *Crawford* is instructive, however, in its pronouncement that, where non-testimonial hearsay is concerned, flexibility is afforded the states "in their development of hearsay law." To be sure, such "flexibility" allows the states to dispense with the requirement of confrontation for non-testimonial hearsay if it is within a "firmly-rooted exception to the Rule"; however, we read that language to cede a certain degree of discretion to the states where the right to confrontation is deemed to be violated by receipt of non-testimonial hearsay covered by the Rule.

Appellant contends the circuit court erred in admitting the autopsy report prepared by Dr. Pestaner, who did not testify, and allowing Dr. Ripple to testify about the findings in the report and refer to it in violation of appellant's right to confrontation. More specifically, he avers that the "distinction between fact and opinion in an autopsy report ... no longer plays a role in determining whether the admission of an autopsy report absent the testimony of the person who prepared the report violates the accused's right to confrontation." In his assignment of error, he relies principally on *Crawford.*[9] He posits:

> Applying *Crawford* to the testimony of a social worker in a child sexual abuse case, this Court, in *Snowden v. State,* 156 Md.App. 139, 846 A.2d 36 (2004), characterized "testimonial" statements as those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 155 n. 26, 846 A.2d 36 (quoting *Crawford,* 124 S.Ct. at 1364). Applying *Crawford* to the facts in this case, as this Court is required to do, *see Smart v. State,* 58 Md.App. 127,

---

9. It should be noted that *Crawford* had not been decided when the instant trial was held.

131, 472 A.2d 501 (1984), there can be no question that the trial court erred in both admitting the autopsy report and in allowing Dr. Ripple to testify regarding the physical "findings" contained in that report.

To properly address appellant's claim that he was denied the right to confrontation, we must first determine the contents of the autopsy report to which appellant specifically interposed an objection, and whether only a portion or all of the autopsy report was admitted into evidence. We have addressed, *supra*, appellant's contention that *Crawford* and *Snowden* dispense with any distinction between fact and opinion. We reject appellant's assertion, relying on *Crawford* that, "although the distinction between fact and opinion in an autopsy report may have been an important one at the time of the motions hearing, that distinction no longer plays a role in determining whether the admission of an autopsy report, absent the testimony of the person who prepared the report, violates the accused's right to confrontation." [10] Contrary to appellant's position, "fact" as defined in *Ward, supra,* continues to be squarely within the firmly fixed exceptions to the hearsay rule. The objectively obtained findings of the physical condition of the victim, not subject to interpretation, constitute the "facts." Appellant also asks us to decide what, in an autopsy report, constitutes an opinion. Next, we must resolve the question of whether such opinions and/or facts, in contemplation of the *Crawford* decision, shall be deemed "testimonial." Finally, assuming the admissibility of Dr. Pestaner's findings, without his testimony, we must decide whether Dr. Ripple may offer her own independent opinion based on the findings in Dr. Pestaner's report.

### DR. PESTANER'S OPINION AS TO CAUSE AND MANNER OF DEATH

 As to the contents of the autopsy report to which appellant specifically interposed an objection, the record un-

---

**10.** Such a holding would require the testimony of the medical examiner who performed the autopsy in order to have it admitted in every case.

equivocally discloses that appellant objected to admission of the report without the testimony of Dr. Pestaner; then he specifically objected to any opinion contained in the report; he also objected to Dr. Ripple's use of the report in formulating her own opinion. Turning to the question of whether all or part of the report was admitted into evidence, we cannot discern from our inspection of the autopsy report contained in the record on appeal that any portion of the report was redacted. The court's statements, however, regarding opinions in the report during the hearing on the Motion to Exclude Testimony of the Medical Examiner, and various references to deletions from the report during examinations of witnesses, indicate that the court did, in fact, redact the cause and manner of death.[11]

------

11. The following colloquy between the court and counsel signify that the court redacted Pestaner's opinion as to cause of death from the autopsy report.

\* \* \*

THE COURT: I want you to wait until the time of trial and we will mark it out and then photocopy it depending upon what she says.
[PROSECUTOR]: Very well.
THE COURT: I rather suspect that you are going to be left with something that is redacted that just says that smothering, hypertensive and arteriosclerotic cardiovascular disease and homicide.
[PROSECUTOR]: That those would be removed?
THE COURT: In my opinion, those would be the only thing [sic] removed unless she says something else that surprises me that some of these other things are matters of opinion, which I don't think they are.
[PROSECUTOR]: Very well.

\* \* \*

[PROSECUTOR]: I'm going to hand you what has been marked as State's exhibit number 29 at this time for the purposes of identification. Going to caution you with regard to two things. Number 1, there have been some matters that obviously are not contained, there is [sic] a couple lines missing, so you don't think I'm tricking you.

\* \* \*

During direct examination of Dr. Ripple, the following transpired:
[PROSECUTOR]: I'm going to hand that to you now and ask if you can review it and if you recognize it?
THE WITNESS: Yes, this is a certified copy of the autopsy report and photograph and toxicology, *save for those items that you stated prior.*
[PROSECUTOR]: Your Honor, I would offer as State's exhibit Number 29 at this time.

During the course of the hearing on the Motion to Exclude the Testimony of the Medical Examiner, the court had decided that "the only thing I can see here that is an opinion is disease ... smothering ... [and] homicide" and disease; the court indicated that it would "make sure that the doctor will say that the rest of these are factual observations." Accordingly, the trial judge redacted what he determined constituted opinion, *i.e.*, the section captioned "manner of death" and the references to smothering, homicide and disease. Consequently, the trial judge removed from the jury's consideration the ultimate conclusion contained in Dr. Pestaner's report that the manner of death was homicide by asphyxiation. There is no issue presented regarding the denial of the right to confrontation,

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Is that what we talked about previously?

[APPELLANT'S COUNSEL]: No additional grounds, Your Honor.

THE COURT: We will just hold it at this time. She will testify to it anyhow, isn't she?

[PROSECUTOR]: Yes.

THE COURT: We will hold it and see what the situation is.

[APPELLANT'S COUNSEL]: Just so the record is clear, I'm objecting.

THE COURT: To the basis of the opinion?

[APPELLANT'S COUNSEL]: Because—in addition to that, it is our contention that since Dr. Pestaner is not testifying, that the document is hearsay, its introduction violates my client's rights to confront and cross-examination of a witness under the Sixth, 14th Amendment of the Constitution and Article 21 of the Declaration of Rights.

THE COURT: We will go over that a little bit later.

\* \* \*

Later in the trial, the autopsy report was re-offered as an exhibit:

THE COURT: Do you have another witness?

[PROSECUTOR]: Yes Your Honor. Actually, first I would re-offer, what is marked as State's Exhibit 29 B, which was the autopsy previously mentioned.

[APPELLANT'S COUNSEL]: Your Honor, my objection is greater than that. If you would like me—

THE COURT: No. We will take care of it later.

[APPELLANT'S COUNSEL]: Nothing specific pertaining to [THE PROSECUTOR'S] reactions but, redactions, but I think there are larger constitutional issues.

THE COURT: I think it is pretty much the same stuff that we talked about. When the jury is back there, then we will address it.

[APPELLANT'S COUNSEL]: Thank you.

therefore, as to Dr. Pestaner's opinion regarding the cause of death.

## FINDINGS OF PHYSICAL CONDITION

■ Appellant also challenges the references in the autopsy report to such characterizations as "chronic," "acute" and "cloudy" because such terms, in appellant's view, are matters of interpretation and, hence, constitute opinions. As we shall discuss, *infra*, we believe these terms are descriptive and may be objectively quantified; thus, they are not subject to significantly different interpretations by the witnesses. More importantly, the descriptive terms in question only tangentially touch upon matters in dispute regarding *corpus delecti* or criminal agency.

■ Here, it was appropriate for the routine and objectively ascertained findings in the autopsy report, including the documentation of hemorrhaging to the mouth and other physical condition of the victim to be submitted to the jury without Dr. Pestaner's testimony. A review of the report of eleven major systems of Ebberts's body reveals that the findings are virtually all descriptive, rather than analytical.[12]

---

12. The following three sections of the autopsy report, we believe, are illustrative of the medical examiner's findings of the condition of the deceased which were objectively ascertained, generally reliable, and normally undisputed:

*HEAD:* (CENTRAL NERVOUS SYSTEM)

The scalp is reflected. The calvarium of the skull was removed. The dura mater and falx cerebri were intact. There was no epidural or subdural hemorrhage present. The leptomeninges were thin and delicate. The cerebral hemispheres were symmetrical and congested. These structures at the base of the brain, including cranial nerves and blood vessels, were intact. Coronal sections through the cerebral hemispheres revealed no lesions. Transverse sections through the brainstem and cerebellum were unremarkable. The brain weighed 1320 grams.

*CARDIOVASCULAR SYSTEM:*

The pericardial surfaces were smooth, listening and unremarkable; the pericardial sac was free of significant fluid and adhesions. The coronary arteries arose normally, followed to the usual distribution and had atherosclerosis as follows: left anterior descending artery and left circumflex artery with 10–30% stenosis and the right coronary artery

Seventy-one year-old Irene Ebberts, who had had a history of emphysema and diabetes and, by all accounts, was in poor health, was found by paramedics lying unresponsive in her bed, when they responded to a call to the scene of a "cardiac arrest." Appellant complains that Dr. Ripple was the only expert to testify that Ebberts died as a result of asphyxiation, that she neither performed the autopsy nor participated in the autopsy. It was appropriate for the routine and objectively ascertained findings in the autopsy report, including the documentation of hemorrhaging to the mouth and other physical condition of the victim, to be considered by the jury without Dr. Pestaner's testimony. A review of the report of eleven major systems of Ebberts' body reveals that the findings are virtually all descriptive, rather than analytical.

In sum, Dr. Pestaner's determination that the cause of death was asphyxiation and the manner of death was homicide, on the other hand, would have unquestionably implicated the Sixth Amendment right to confrontation in a case where there was credible evidence that the victim's death was the result of natural causes and the most hotly contested issue was *corpus delecti*. Because the court, recognizing the implications of admitting any opinion contained in the report,

---

had 50–60% stenosis. The chambers and valves exhibited the usual size position relationship and were unremarkable. The left ventricular free wall was 1.6 cm in thickness. The myocardium was dark red-brown, firm and unremarkable; the atrium and ventricular septa were intact. The aorta and its major branches arose normally, followed the usual course, and had marked atherosclerosis. The venae cavae and their major tributaries returned to the heart in the usual distribution and were free of thrombi. The heart weighed 350 grams.
*RESPIRATORY SYSTEM:*
The upper airway was clear of debris and foreign material; the mucosal surfaces were smooth, had scattered erythema with yellow mucus in branching airways. The pleural surfaces had posterior adhesions with scattered bullae that were up to 5 cm. The pulmonary parenchyma was red-purple, exuding slight to moderate amounts of frothy edema; the right middle lobe was focally firm and had dark discoloration. The pulmonary arteries were normally developed, patent and without thrombus or embolus. The right lung weighed 610 grams; the left 490 grams.

excluded such opinion evidence, appellant's right to confront his accusers was not abrogated.

An autopsy report, prepared by an ostensibly neutral party—the medical examiner—documenting objective findings, is the quintessential business record. In the typical murder case, the State introduces the autopsy report to establish *corpus delecti, i.e.*, the body of the crime. Because the medical examiner is rarely, if ever, present at the scene of the crime at the time of its commission, the cause and manner of death as deduced from an autopsy report must be limited to analyses of the physical condition of the deceased and to any conclusions which enjoy a generic indicium of medically accepted reliability. The case *sub judice*, unlike most murder trials, is particularly susceptible to a Sixth Amendment analysis because of the centrality of the medical examiner's opinion as to whether the alleged victim died of natural causes or as the result the felonious act of another because it was vigorously contested. Although there apparently had been rummaging around in the bedroom, there were no signs of trauma, there were no gunshot or stab wounds, and there were no signs of a struggle.

Appellant asseverates that, had Dr. Pestaner been required to testify, he would have had to explain, on cross-examination, his failure to photograph or diagram the injury to Ebberts' mouth (which was critical to Dr. Ripple's finding of asphyxiation); his failure to include in the autopsy report any reference to the greenish discoloration; and his failure to render an opinion as to whether the corneal cloudiness he noted in the report could have occurred during the refrigeration of Ms. Ebberts' body before the autopsy was performed. Appellant says that he could have cross-examined Dr. Pestaner as to the basis of his finding of cause of death and the significance of the injury to the victim's mouth.

In cataloguing questions he asserts he should have been afforded the opportunity to ask Dr. Pestaner on cross-examination, appellant obviously attempts to restrict the proposed questions to those matters uniquely within Dr. Pestan-

er's knowledge or comprehension. Appellant's right to cross-examination, however, extends to a solemn declaration or affirmation made for the purpose of establishing or proving some fact. *Crawford,* 541 U.S. at ——, 124 S.Ct. at 1363. Having determined that the matters not redacted from the autopsy report were findings of the physical condition of the victim which were objectively ascertained and generally reliable, cross-examination of Dr. Ripple afforded him his right of confrontation, given that her opinion as to manner of death is what appellant sought to refute. Indeed, as we noted, his complaints focus on Dr. Pestaner's failure to photograph or diagram the victim's mouth, the failure to reference the greenish discoloration, and the failure to render an opinion regarding the corneal cloudiness. These matters do not constitute "testimonial" evidence as contemplated by *Crawford.*

We hold that the findings in an autopsy report of the physical condition of a decedent, which are routine, descriptive and not analytical, which are objectively ascertained and generally reliable and enjoy a generic indicium of reliability, may be received into evidence without the testimony of the examiner. Where, however, contested conclusions or opinions in an autopsy report are central to the determination of *corpus delecti* or criminal agency and are offered into evidence, they serve the same function as testimony and trigger the Sixth Amendment right of confrontation.

In the case at hand, the evidence indicating that death resulted from homicide rather than natural causes was the testimony of Dr. Ripple. She relied on findings of the physical condition of Ms. Ebberts in the autopsy report prepared by Dr. Pestaner. Her reliance thereon was appropriate.

## *CIRCUMSTANCES SURROUNDING DR. PESTANER'S DETERMINATION*

The body of Irene Ebberts was found on October 19, 2001. Dr. Pestaner performed his autopsy report on October 20, 2001, but indicated on the report that his determination of cause of death was "pending." He then changed the status

from pending and entered cause of death on October 29, 2001 as "smothering, a lack of oxygen from covering the nose and mouth." Under "Manner of Death" in the October 29th report, Dr. Pestaner indicated "homicide." During that ten-day interim, the activity log reflects numerous discussions between the police and Dr. Pestaner. Appellant suggests that, although he had already made his determination of cause and manner of death, Dr. Pestaner received a fax on October 22, 2001, from Sergeant Rose Brady, a supervisor in the Homicide Division of the Baltimore County Police Department, asking him to delay preparation of the death certificate. The fax stated: "Joe Please review. This guy is too dangerous to leave out. We are getting the murder warrant for him without [a finding of] cause of death."

From the correspondence in the file, appellant suggests that Dr. Pestaner may well have intended to enter on the death certificate that the manner of death was natural causes, had he not received the entreaty, "Would like to discuss, wait until Monday to officially change DC. [Death Certificate]." We have reviewed the exhibits, including the initial death certificate, which is only partially completed.[13] We are not swayed by appellant's point (apparently, to indicate bias) that the only expert to testify that the victim died as a result of smothering "was an employee of the Medical Examiner's Office for the State of Maryland." We are, however, troubled if Dr. Pestaner was prepared to render an opinion that Ebberts died of natural causes, but relented and

---

13. The initial death certificate contains the victim's name, address, and time and date of death. Various boxes on the certificate were also checked, indicating: that the victim was not pregnant, that an autopsy was performed, that the autopsy findings were available prior to completion (on the form) of cause of death, that the case had been referred to the medical examiner, and whether tobacco use contributed to the death of the decedent was unknown. The space provided for "cause of death" was left blank and the boxes pertaining to the subject were not marked. The unmarked boxes are designated natural, accident, suicide, pending investigation, or could not be determined. Dr. Ripple had indicated that the word, "pending," was penciled on the copy to which she referred during her testimony. The death certificate had been signed by Dr. Pestaner and was dated October 20, 2001.

ultimately changed the death certificate to indicate homicide by asphyxiation.

Appellant would certainly be entitled to have brought to the attention of the jury any impropriety in the communications between Dr. Ripple and the Baltimore County homicide detectives. Appellant does not contend that the findings of the physical condition of Ms. Ebberts do not accurately describe the deceased at the time of the examination. In the absence of an assertion that the findings recorded on the tenth day are different from what Dr. Pestaner would have recorded had he filled out the death certificate immediately, we are loathe to reverse appellant's conviction based solely on the failure of the police to maintain an arms' length relationship. Although it is entirely appropriate for the medical examiner to gather information regarding the circumstances surrounding the demise of a decedent, we certainly do not countenance a medical examiner being influenced, pressured or coerced in his or her professional judgment, in derogation of that professional judgment.

### REFERENCE TO AUTOPSY DURING TESTIMONY

Appellant also asserts that Dr. Ripple was improperly permitted to reference the autopsy report during her testimony. Our prior discussion regarding the right to confrontation effectively disposes of this contention. Reference to a routine record containing a statement of fact or condition objectively ascertained does not offended the right to confrontation. Assigning a particular significance to a physical condition, however, encroaches into the realm of opinion. As we have indicated, it was entirely proper for Dr. Ripple to refer to the objective findings contained in the report. The objectively ascertained findings of Dr. Pestaner could then form the basis for Dr. Ripple to render her own independent opinion. Stated otherwise, insofar as Dr. Ripple referred to anything in the report that was conclusory rather than descriptive, such testimony impinged on appellant's right of confrontation. As noted, *supra,* Dr. Ripple viewed Dr. Pestaner's findings in the autopsy report, and she, as well as appellant's experts, referred to and utilized the report in reaching their conclusions.

The reference to the objective findings by the experts was perfectly proper. Reliance by the experts on Dr. Pestaner's conclusions would, however, require his availability for cross-examination.

## II

Appellant's second assignment of error is set forth in his brief as follows:

Dr. Ripple testified that to a reasonable degree of medical certainty, the "hemorrhage in the gum occurred at the time of death." Dr. Ripple further testified that the bruises on Ms. Ebberts gums were also "fresh injuries" that occurred near death.

Even if this Court were to somehow find that the testimony given by Dr. Ripple, testimony that was based largely in part on the autopsy report prepared by Dr. Pestaner was not a violation of the appellant's right to confrontation, the trial court still erred in allowing its admission. Dr. Ripple's testimony regarding her expert opinion as to Mrs. Ebberts' cause of death not only lacked an adequate factual basis, but was derived from information unrelated to medical findings.

He also contends that, by stating the victim "died of asphyxia during the robbery," Dr. Ripple "encroached into the jury's domain," her statement was not "appropriate," nor did it "assist the jury as Maryland Rule 5–702 requires," and her testimony related to the credibility of a witness.[14]

Md. Rule 5–702 states:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, train-

---

**14.** Appellant cites numerous opinions from other jurisdictions in support of his position in this Court. We answer this question with Maryland law.

ing, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Appellant argues "the State simply failed to satisfy the third requirement," *i.e.,* that Dr. Ripple's testimony, without reference to the autopsy report and its findings, lacks sufficient factual support, as required by the Rule.

Appellant's argument that Dr. Ripple's testimony, without reference to the autopsy report and its findings, lacks a sufficient factual basis is little more than a restatement of the argument that admission of the report was a violation of appellant's right of confrontation. In other words, the reason for precluding Dr. Ripple from referencing the report was because appellant should have been afforded an opportunity to cross-examine Dr. Pestaner in the first instance. It was perfectly appropriate for Dr. Ripple to have testified for either side, and in doing so, to use the autopsy report as the basis of her testimony. The provisions of Maryland Rule 5–702, therefore, are not implicated.

He asserts that Dr. Ripple "encroached into the jury's domain in concluding that the victim died of asphyxiation," that her statement was not "appropriate," nor did it "assist the jury as Maryland Rule 5–702 requires," and her testimony related to the credibility of a witness. These claims of error are without merit. Determination of the cause and manner of death is indeed the responsibility of the medical examiner, and her opinion on the ultimate issue, based on the report prepared by Dr. Pestaner, was proper. We perceive no error in allowing Dr. Ripple to testify as to the ultimate issue.

### III

Appellant contends the trial court erred when it allowed Dr. Ripple to testify as a rebuttal witness because she violated the sequestration rule. We disagree.

Maryland Rule 5–615 provides:

(a) Except as provided in sections (b) and (c) of this Rule, upon the request of a party made before testimony begins, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses ... The court may order the exclusion of a witness on its own initiative or upon the request of a party at any time.

(b) A court shall not exclude pursuant to this Rule

(3) an expert who is to render an opinion based on testimony given at trial ...

(e) The court may exclude all or part of the testimony of the witness who receives information in violation of this Rule.

In the case *sub judice*, the court directed that certain witnesses be sequestered and allowed Dr. Ripple to remain in the courtroom during trial, as she was going to be called as a rebuttal witness to specifically rebut the testimony of Dr. Callery. After appellant objected, Dr. Ripple subsequently testified as a rebuttal witness and stated that she disagreed with many of Dr. Callery's findings. Dr. Fowler, who was sequestered, then testified that he had discussed some of the testimony of Dr. Callery and Dr. Amrine with Dr. Ripple, prior to his testimony. The circuit court found that he violated the sequestration order by hearing parts of the testimony from Dr. Ripple and he therefore was not allowed to testify. When the jury was dismissed, appellant reasserted his objection to Dr. Ripple's rebuttal testimony. Appellant, in his brief, states that, had Dr. Ripple not violated the sequestration order when she relayed information to Dr. Fowler about certain testimony, her rebuttal testimony may have been proper.

The Court of Appeals has stated:

The general purpose of the sequestration of witnesses "has been to prevent ... witnesses from being taught or prompted by each other's testimony". Additionally, the object of Maryland Rule 5-615 "is to prevent one prospective witness from being taught by hearing another's testimony; its application avoids an artificial harmony of all the testimony; it may also avoid the outright manufacture of testimony."

*Tharp v. State,* 362 Md. 77, 95, 763 A.2d 151 (2000) (citations omitted). *See Edmonds v. State,* 138 Md.App. 438, 448–49, 771 A.2d 1094 (2001). This Court held in *Jones v. State,* 125 Md.App. 168, 172–73, 724 A.2d 738 (1999), *rev'd on other grounds,* 357 Md. 408, 745 A.2d 396 (2000), that "section (e) of Md. Rule 5–615 permits exclusion by the court of the testimony of a witness who has *received* information in violation of the rule."

In *Jones,* the trial court sequestered all potential witnesses from the courtroom and directed them not to discuss their testimony with each other during trial. *Id.* at 171–72, 724 A.2d 738. Witness Reavis testified, followed by witness Goode, and appellant subsequently informed the court that they had relayed their testimony to sequestered witnesses who had not yet testified. *Id.* at 172, 724 A.2d 738. Reavis admitted she talked with other sequestered witnesses about questions she was asked and the defendant sought to strike her answers because she violated the sequestration order. *Id.* We stated that "[t]he purpose of the sequestration of witnesses has been said to be to prevent them from being taught or prompted by each other's testimony." *Id.* at 173, 724 A.2d 738 (quoting *Redditt v. State,* 337 Md. 621, 628, 655 A.2d 390 (1995)). We opined that when sanctions are imposed for a violation of the sequestration order, those decisions are "left to the sound discretion of the trial judge." *Id.* (quoting *Redditt,* 337 Md. at 629, 655 A.2d 390). We concluded:

> Section (e) of Md. Rule 5–615 permits exclusion by the court of the testimony of a witness who has *received* information in violation of the rule. In this case, Reavis did not *receive* information in violation of the sequestration order. Rather, she *imparted* information to other potential witnesses after she already had testified. Thus, to the extent that Reavis violated the sequestration rule, her conduct did not taint her own testimony. Exclusion of her testimony was not a permitted sanction under Md. Rule 5–615(e) and would not have served the purposes of the sequestration rule in any event. The trial court did not abuse its discre-

tion in denying appellant's motion to strike Reavis's testimony.

*Id.*

Dr. Ripple was never sequestered. Rather, she was permitted to listen to other witness testimony to specifically rebut it. Although she may have imparted certain information about testimony to Dr. Fowler, and consequently tainted his testimony, she received no information about testimony in violation of the sequestration order that affected her testimony. The court, in fact, exercised its discretion and did not allow Dr. Fowler to testify because of the violation. Dr. Ripple, however, was not "taught" or "prompted" by another witness's testimony; rather, she only expressed her opinion as to why she disagreed with Dr. Callery's testimony. There is no indication from the record that her conversation with Dr. Fowler resulted in her learning anything about another witness's testimony in violation of the Rule. Dr. Ripple did not violate the sequestration order and the trial court did not abuse its discretion in allowing Dr. Ripple to testify on rebuttal.

 Dr. Ripple's rebuttal testimony was proper. Rebuttal evidence is "any competent evidence which explains, or is a direct reply to, or a contradiction of any new matter that has been brought into the case by the defense." *Collins v. State,* 373 Md. 130, 142, 816 A.2d 919 (2003); *See Shemondy v. State,* 147 Md.App. 602, 615, 810 A.2d 36 (2002). The trial court has the discretion to determine what constitutes rebuttal evidence and will be reversed only if it is "manifestly wrong and substantially injurious." *State v. Booze,* 334 Md. 64, 68, 637 A.2d 1214 (1994) (quoting *Mayson v. State,* 238 Md. 283, 289, 208 A.2d 599 (1965)); *Shemondy,* 147 Md.App. at 615, 810 A.2d 36. In the case *sub judice,* Dr. Ripple contradicted and replied to the testimony of Dr. Callery. It was within the sound discretion of the circuit court to permit her rebuttal testimony and we perceive no error in its decision.

90

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-
MORE COUNTY AFFIRMED.

COSTS TO BE PAID BY APPELLANT.